THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ANTON JOHNSON, Defendant-Appellant.

First District (5th Division) No. 1—87—2751

Opinion filed September 6, 1991.

Randolph N. Stone, Public Defender, of Chicago (Ruth A. McBeth, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Inge Fryklund, Kenneth T. McCurry, and Timothy F. Moran, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Defendant, Anton Johnson, was tried by a jury and found guilty of murdering John O'Neal. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2).) He was sentenced to a term of 30 years' imprisonment. On appeal, he contends that: (1) the State failed to rebut the *prima facie* case of discrimination, and instead, proffered reasons that were merely a pretext for excluding prospective black jurors on account of their race; (2) he was denied a fair trial due to the prosecutor's irrelevant and prejudicial insinuations that he was a member of a gang and as a result was motivated to kill; (3) he was denied a fair trial resulting from prosecutorial misconduct and overreaching; and (4) he was denied a fair trial because the trial court refused to submit his proffered eyewitness identification instructions to the jury.

THE *VOIR DIRE*

On July 27, 1987, the trial court conducted a *voir dire* examination of prospective jurors. The record on appeal discloses that of the 25 venire members who were reached for *voir dire*, four were black. However, the record does not indicate either the number or the racial composition of those venire members in the array who had not reached the *voir dire* stage. During the *voir dire*, the State peremptorily challenged five prospective jurors. Of those five, three were black and two were white. Defendant, who is black, exercised peremptory challenges to excuse four prospective jurors. Of those four, three were not black, while the race of the fourth is not reflected in the record. Twelve jurors and two alternates were selected. Of the selected jurors, one was black while the remaining 11 were not black, although the record does reflect that at least two were Hispanic. The trial court itself discharged two venire members.

The three black venire members excused by the State were Shirley McGee, James Norwood, and David Neely, and they possessed the following characteristics:

(1) *Shirley McGee* lived with her son on West Wallon in Chicago, was single and had never been married. She had been unemployed for approximately one year. She had been burglarized three years before. She had no prior jury service. Her landlord was a sergeant in the Chicago police department.

(2) *James Norwood* was married and had lived on South Ashland in Chicago for five years and had never served on a jury. He worked as a paint filler in a manufacturing company. He personally knew no one who worked in the law enforcement or in any law-related field, and neither he nor any members of his immediate family had been victims of crime.

(3) *David Neely* was single and had lived at 6200 South Saint Lawrence in Chicago for five years. Prior to living there, he had lived at 5700 South Bishop for 10 years. He graduated from Chicago State University, which is located on 95th and King Drive. For two years, he had been a fifth-grade teacher at the Saint Alberts School located on 90th and Harper in Chicago. He never before served on a jury, knew no one who worked in law enforcement or in any law-related field, and neither he nor any members of his immediate family had been victims of crime. (Neely was initially accepted by the State as a juror; however, after the defense excused three other jurors, the State excused Neely.)

Before the *voir dire* examination had been completed, defense counsel objected to the jury selection on the ground that the State had exercised peremptory challenges to exclude blacks from the jury. Defense counsel specifically referred to one of the peremptorily challenged black prospective jurors, David Neely, and compared him to one of the accepted white jurors, Peggy Sutorious. (In regard to Sutorious, *voir dire* questioning revealed that she had lived in North Lake, Illinois, for 25 years; lived with her parents; had never been married; taught math for three years in District 88, and prior to that taught in Districts 83 and 87 in Berkley and Franklin Park. Sutorious' father worked as a salesman at Marshal Fields in Oak Brook; and her mother was a secretary for The Baseball School of USA.)

Without explicitly articulating whether or not a *prima facie* case of racial discrimination in juror exclusion had been established, the trial judge then asked the State to respond to the defense counsel's objection. The State pointed out that of the five prospective jurors peremptorily challenged by the State, two were white, and the trial court asked why the State had excluded Neely. The assistant State's Attorney explained he felt that Neely "would be more inclined to lean toward the Defense than to the State" because he lived, taught and had gone to college in the inner city.

The trial judge then inquired about the remaining two prospective jurors peremptorily challenged by the State. Before giving the State an opportunity to respond, the trial judge remarked, "One was a woman who apparently had an illegitimate child, Miss McGee." Defense counsel countered that McGee was "single, employed and worked as a phone operator." The trial judge then initially concluded, "I can't see any systematic exclusion, there are two Latinos on the Jury who are minorities but there is one other Juror, one black, I can't see systematic exclusion." Yet, despite his conclusion that there was no "systematic exclusion," the trial judge then asked the prosecutor why the State had peremptorily challenged Norwood. He replied:

> "I don't believe he was attentive during the questioning, he appeared to be disinterested, he appeared to be sleeping when other people were being questioned."

The trial judge then remarked, "Well, he didn't bother me because he was rather quiet there, I don't know about him." The trial judge then denied defendant's motion, noted that the sworn panel contained three "minority" jurors, and the case proceeded to trial.

## THE TRIAL

The pertinent testimony adduced at trial is as follows. Flora

O'Neal, the victim's mother, testified that the victim, John O'Neal, had lived with her at 9215 South Woodlawn in Chicago, prior to his death on September 13, 1986.

Tony Rice, the victim's friend, testified that he lived at 4101 South Federal in Chicago. Shortly after 6 p.m. on September 13, 1986, he was in front of a food store on 43rd and State Streets with his brother, John Rice, and his friends, Tony Pierce, Sammy Jones, and the victim. Together they walked northbound towards the intersection of 42nd and State Streets.

Suddenly defendant appeared from behind a field house, 25 feet away, and began shooting at the group. Tony shouted a warning, then he and all his companions ran. As Tony ran, he fell behind an automobile, and he watched with an unobstructed view as the defendant continued shooting. Defendant then ran behind the field house. Tony discovered that the victim had been shot. Tony told the police on the night of the shooting that he had previously seen defendant three or four times "in the neighborhood," although he did not know defendant's name.

Tony further testified that at approximately 10 p.m. on the following day, while he and Sammy Jones were riding around the neighborhood with two police officers, he spotted the defendant and pointed him out.

On cross-examination, Tony testified that immediately after the incident he described the defendant to Officers Argenbright and Scannell. He told both officers that the defendant had a light mustache, shoulder-length hair and "he had his hair slick back into the wave." Tony added on redirect that he told the police that defendant wore blue jeans and a gray jacket; he had "slick hair and a wave," *i.e.,* "processed" hair which was shoulder-length; he was thin, brown skinned, and about 5 feet 9 inches tall. Tony denied telling the police there were three offenders, or that the offenders wore their hats to the right side.

John Rice, the victim's friend, testified that he also lived at 4101 South Federal Street, as had the victim. John Rice testified for the State on direct examination that he was familiar with street gangs called the "Cobra Stones" (Stones) and the "Black Gangster Disciples" (Disciples), admitting to having once been a member of the Stones. He stated that the Stones, who controlled the building where he lived, and the Disciples, who controlled the building next to his, at 4037 South Federal, were rival gangs and at war. He stated that the Disciples controlled the park area from which the defendant had emerged when he began shooting.

John further testified that while he walked with his brother and the victim on State Street, he saw defendant pull out a gun, heard him shout something, and saw him fire approximately six shots. John had previously seen defendant "a few times around the neighborhood." John described defendant to the police as being 5 feet 9 inches tall, 150 to 160 pounds, wearing a gray jacket and blue jeans, with shoulder-length hair "slick back." He identified the defendant in a lineup the night after the shooting. Previously, John had been convicted of aggravated battery in 1981 and armed robbery in 1982.

On cross-examination, John denied telling the police there had been more than one offender.

Sammy Jones, along with the two Rice brothers and the victim, lived at 4101 South Federal. Jones testified to essentially the same events as Tony except that he did "[n]ot exactly" see the shooter. When he heard the first shot, he ran. On cross-examination, he initially testified that he informed the police officers that a group of three individuals fired those shots. He later testified that he did not specify a precise number of individuals. "I couldn't see how many it was, I didn't see."

Detective William Murphy of the Chicago police department testified that on the evening of September 14, 1986, he drove Tony and Sammy around the neighborhood to look for the offender and any witnesses. At approximately 11:30 p.m., Tony saw the defendant at the park located at 4200 South State Street and identified him as the offender. Defendant was placed under arrest. John later identified defendant in a lineup. The police telephoned Pierce, who reported that he would not be able to identify the shooter.

After the State rested its case, several witnesses testified on behalf of the defendant. James Scannell, who had been a Chicago police officer for one year, testified that he was the first to arrive at the scene. He interviewed Tony Rice, John Rice, Sammy Jones, and other witnesses. He did not see Pierce. The victim's companions told Scannell that the shots were fired by only one individual. Scannell, however, acknowledged that his police report seemed to indicate that the shots had been fired by three offenders, who all wore their hats to the right. The police report did not note the names of any witnesses who might have reported more than one offender.

William Henderson, a friend of the defendant, testified for the defense that he lived in apartment 1309 at 4037 South Federal Street and that Fred Khaton lived next door in apartment 1308. William stated that from 1 p.m., when he first saw defendant, until 11:15 p.m. on September 13, 1986, he was in and out of Fred's apartment.

Defendant, Fred and Tessie Khaton were in the apartment during the entire period. When William heard a gunshot, he and defendant were on the couch watching television. They stepped out onto the porch and saw people running towards a garage. William's mother, Fannie, and his cousin George Henderson were already on the porch. William denied telling the police that he and defendant were already on the porch when the shots were fired.

William testified that he and defendant never left the building. When William left at 11:15 p.m., defendant was still at Fred's apartment. William denied telling the police that Fred left at 5 or 6 p.m.; he actually left at 8 p.m. William denied telling the police that he and defendant left the building at 2 p.m.

On cross-examination, William testified that he did not know if Disciples ran his building, or any gang ran any of the nearby buildings, although he had heard of the Disciples. When asked if he had heard of the Cobra Stones, William replied, "I'm in no gang." He was unsure if the Stones and Disciples were enemies. "I guess they are. I don't know."

Herman Jackson, a tow truck driver, testified for the defense that on September 13, 1986, he brought an automobile to a repair shop at 42nd and State Streets. At about 4 or 4:30 p.m., he heard five or six shots and saw two men running across the street. One of them said he had been shot. A dozen people were on the other side of the street. Jackson also saw another man who was "kind of husky" and with short hair running west toward the railroad tracks. Jackson did not see the shooter.

Edith Scanlan, who lived in apartment 1510 at 4037 South Federal Street, testified that at about 6:45 p.m. on September 13, 1986, she was looking out her window at the porch outside of apartment 1308, two floors below, because she was going to ask either her son or defendant to go to the store. She could see the defendant, who was not wearing a shirt, standing on the porch in front of apartment 1308. She then heard a single gunshot and asked the defendant if he had heard it. She also asked defendant to see if her son was in Fred's apartment. Defendant went in to check and was gone "a few minutes." He then returned to the porch. "Then we heard a couple of more shots ring out." At that point, Fannie Henderson and Tessie Khaton joined defendant on the porch. She did not see William or Fred on the porch.

Fannie Mae Henderson, William's mother, testified that she lived at 4037 South Federal in apartment 1309. After 7 p.m. on September 13, 1986, she saw defendant standing with her son on the porch. She

heard no shots. On September 12, defendant had slept overnight at her house and thus was there in the morning on September 13. Defendant was with her son all day.

The defendant testified on direct examination that at 5 p.m. on September 13, 1986, he was in Fred's apartment with William, Fred and Tessie. Shortly after 6 p.m., and while still in that apartment, he heard a gunshot. He went out on the porch and saw police cars and an ambulance on 42nd and State Streets. He stayed on the porch with William, and Fred went back inside. He denied either being in the park between 6 and 7 p.m. or firing any shots.

At the time of his arrest, the defendant had long hair which was slicked back. He was 5 feet 9 inches tall and weighed 145 pounds. He wore a black leather jacket and grey pants on September 13, 1986.

On cross-examination, the State inquired as follows:

"[PROSECUTOR]: Mr. Johnson, do you belong to any gangs?

A. No.

Q. You do not belong to a gang?

A. No.

Q. You are not a member of the Black Gangster Disciple[s]?

A. No.

[DEFENSE COUNSEL]: Objection, Judge. He's asked and answered.

THE COURT: That answer is no.

[PROSECUTOR]: Do you affiliate with any people that are Black Gangster Disciples?

A. Yes.

[DEFENSE COUNSEL]: Objection, Judge.

THE COURT: Overruled.

[DEFENSE COUNSEL]: What difference does that make?

THE COURT: Overruled.

[DEFENDANT]: Yes."

The State continued asking questions concerning defendant's knowledge of gang activity in the area of Chicago where the shooting occurred. Defense counsel's repeated objections were overruled.

Defendant denied that he initially informed the police officers that he was with his girl friend for the entire day and that he changed his version of his whereabouts when the police officers told him that they were going to verify his statements with his girl friend. Instead, he said that he informed the officers that he had been waiting for his girl friend all day at his grandmother's and Uncle Fred's apartment at 4307 South Federal. He told the police officers that he had spent the

night at William Henderson's apartment, and on the morning of the shooting, he was at his grandmother's apartment.

Defendant stated that when he heard the shots, he was watching television with William. Defendant, William and Fred went out onto the porch. George was already there. He heard several more shots. Scanlon asked him to see if her son was at Fred's, and he did so. Defendant later added that Fannie was on the porch; then added that some of Fred's friends were there; and then added that his cousin Calvin was on the porch, too.

Fred left the apartment after the shots were heard and went to see his girl friend. From her house, he telephoned to say he had discovered someone was shot. Defendant left the building briefly at 8 p.m. to go to the store. He later left the building before 11 p.m. to go home.

Defendant testified that he had seen Tony Rice in the building at 4101 South Federal but he did not know him, or the victim, or their companions. He had never had problems with Tony Rice. He did not know why John Rice would identify him in a lineup.

Detective Murphy was then recalled by the State to testify in rebuttal. He stated that defendant initially told him that he had spent the day with his girl friend on September 13, 1986. When he asked the defendant for his girl friend's telephone number and address, defendant then responded that he was at his grandmother's apartment on that day and not at his girl friend's place. Defendant told him that he and William were on the porch at about 7 p.m. talking about females when they heard shots. At that point, Fred came out and told him that a boy had been shot. Defendant also told Murphy that he first left the building at 8 p.m to go to a drug store. Defendant left his grandmother's apartment at approximately 10 p.m. on that day.

Murphy further testified that on September 15, 1986, he spoke to William Henderson, who told him that at 2 p.m. on September 13, he and the defendant left Fred's apartment to meet with their girl friends. They were with their girl friends for a couple of hours and then returned to the apartment. Fred left between 5 and 6 p.m., and they did not hear from him again until about 8 p.m. when he called them and told them that a boy had been shot. According to Murphy, William also stated that he and defendant were sitting on the porch watching a basketball game being played below them in the park, and talking about women, when they heard the gunshots.

Defendant then called Detective McGuire to testify. McGuire stated that Tony and John Rice told him that the individual who fired

the shots wore a gray jacket, dark pants, and had on a light-colored hat. According to McGuire, neither John nor Tony ever told him that they had seen the defendant on a prior occasion. On cross-examination, he testified that John and Tony informed him that the person who fired the shots had slick hair of shoulder length.

The jury found defendant guilty of murder, and he was sentenced to 30 years' imprisonment. Defendant now appeals his conviction.

## Opinion

Defendant first contends that he was denied equal protection when the State violated the rule under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, by exercising its peremptory challenges to systematically exclude blacks from the jury.

Under *Batson*, defendant must make out a *prima facie* case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. (*Batson*, 476 U.S. at 93-94, 90 L. Ed. 2d at 86, 106 S. Ct. at 1721.) In order to establish a *prima facie* case, defendant must show he is a member of a cognizable racial group, demonstrate that the State exercised peremptory challenges to remove members of that group, and show other relevant circumstances raising an inference that the prosecutor used a jury selection practice to exclude venirepersons due to their race. *People v. Mahaffey* (1989), 128 Ill. 2d 388, 412-13, 539 N.E.2d 1172.

Once a *prima facie* case of discrimination has been established, the State bears the burden of coming forward with a neutral explanation for excluding each black venireperson, and the explanation must be related to the particular case to be tried. (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.) The State must show more than an intuitive judgment that black jurors will favor black defendants. (*People v. Batchelor* (1990), 202 Ill. App. 3d 316, 323, 559 N.E.2d 948.) However, the State's explanations need not rise to the level justifying a challenge for cause. *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

After the State has presented its race-neutral basis for exercising peremptory challenges against venirepersons, the trial court must determine whether the defendant has established purposeful discrimination. (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1724.) This determination is one of fact, turning largely on questions of credibility, and thus the trial court's findings must be afforded great deference. *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.

A reviewing court may not make an "independent" review of a trial court's rejection of a *Batson* claim. (*Hernandez v. New York* (1991), 500 U.S. ___, 114 L. Ed. 2d 395, 410, 111 S. Ct. 1859, 1870.) The court on appeal may not overturn the trial court's finding on the issue of discriminatory intent unless its determination is clearly erroneous. That is, the evidence must be such that a " 'reviewing court on the entire evidence [would be] left with the definite and firm conviction that a mistake ha[d] been committed.' " (*Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871, quoting *United States v. United States Gypsum Co.* (1948), 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542.) Where there are " 'two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871-72, quoting *Anderson v. City of Bessemer* (1985), 470 U.S. 564, 574, 84 L. Ed. 2d 518, 528, 105 S. Ct. 1504, 1511.

Apparently 3 of the 12 jurors here were minorities, including one black juror. The State exercised three of its five peremptory challenges on blacks. The other two members who were peremptorily challenged by the State were white.

■ Defendant maintains that he established a *prima facie* case of racial discrimination in the State's use of peremptory challenges. He asserts that "[i]n asking the State for race-neutral reasons, the judge implicitly found the existence of a *prima facie* case." The State counters that the trial court found that defendant failed to make out a *prima facie* case when it asked the State to provide reasons for its challenges.

In *People v. Hope* (1990), 137 Ill. 2d 430, 560 N.E.2d 849, our supreme court held that the trial court must not collapse the *Batson* procedural steps into an undifferentiated review of defense contentions and prosecutorial explanations. Instead, the trial court must first make a finding on the threshold question of defendant's *prima facie* case.

In *Hope v. Illinois* (1991), ___ U.S. ___, 115 L. Ed. 2d 966, 111 S. Ct. 2792, however, the United States Supreme Court granted defendant's writ of *certiorari*, vacated the judgment in *Hope* and, without explanation, remanded it to the Illinois Supreme Court for further consideration in light of *Hernandez v. New York*.

The Court in *Hernandez* held that where the trial court collapsed the *Batson* procedural steps, such a "departure from the normal course of proceeding need not concern us." (*Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.) "Once a prosecutor

has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot." (*Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.) The Court concluded that the "standard inquiry into the objecting party's *prima facie* case was unnecessary given the course of proceedings in the trial court." *Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 414, 111 S. Ct. at 1873.

In the present case, the trial court made no finding on the question of whether or not defendant had established a *prima facie* case, but instead asked the State for its explanation. Thus, the issue of whether defendant made a *prima facie* showing became moot and merged into the question of whether the explanations offered by the State were race-neutral. This brings up defendant's next contention.

Defendant maintains that the State failed to offer racially neutral reasons for dismissing the black jurors Norwood, McGee and Neely.

■ Both the trial court and defendant focused mainly on juror Neely. (Defendant's post-trial motion states that the court erred in overruling defense objections to the State's use of peremptory challenges, "particularly in the case of Juror Neely.") The State offered the following explanation to the trial court:

"THE COURT: State, what do you wish to say?

[PROSECUTOR]: Judge, first we have used five peremptory challenges, we have challenged two whites in addition—

THE COURT: No, the sole issue is why you excused the last one.

[PROSECUTOR]: Mr. Neely?

THE COURT: Yes.

[PROSECUTOR]: I just feel he would not be a good Juror for the State, I do not feel that he would be impartial and for my own personal belief I do not feel that he—I feel that he would be more inclined to lean toward the Defense than to the State.

THE COURT: Why?

[PROSECUTOR]: Just because of the fact of where he lives, 62nd South St. Lawrence which, as you know, is in the inner city, he is also teaching at 90th and Harper which again is inside the inner city, he went to Chicago State University, 95th and King Drive and for those reasons I do not feel that he would be a fair and impartial Juror."

In determining whether discriminatory intent existed, it is significant that Neely was initially accepted by the State. The State accepted a panel of jurors which included Neely. The State tendered the panel to defendant. Defendant then excused three of the jurors. It was only then, after defendant had altered the makeup of the panel, that the State excluded Neely.

> "That a prosecutor had peremptory challenges remaining but did not use them to strike a black venireperson can also indicate an absence of an intent to discriminate. The prosecutor accepted and tendered to the defendant a panel containing a black woman. The prosecutor excused the black woman only after the defendant exercised 10 peremptory challenges, which altered the panel gender. The black woman was excused along with two other women in an attempt, the prosecutor says, to change the gender balance of the panel." *People v. Hooper* (1989), 133 Ill. 2d 469, 511, 552 N.E.2d 684.

While the State never articulated the reason that defendant's peremptory challenges altered the panel's makeup (see *People v. Harris* (1989), 129 Ill. 2d 123, 184-85, 544 N.E.2d 357 (court cannot presume or infer neutral explanation where State did not articulate it)), a reviewing court can consider facts which the trial court "could have relied on." *Hernandez v. New York*, 500 U.S. at ___, 114 L. Ed. 2d at 412, 111 S. Ct. at 1872.

Defendant argues that the fact that Neely was from the inner city "is merely a euphemistic way of saying that Mr. Neely is black." Moreover, the scene of the crime was 20 blocks from Neely's home; 48 blocks from the school where he taught fifth grade; and 53 blocks from his *alma mater*. Defendant maintains that "[i]f an 'inner city' connection, even one miles [*sic*] from the scene of the crime, were to suffice as a racially neutral explanation for excluding black venirepersons, then the protections of *Batson v. Kentucky* would be meaningless." This disproportionate impact would result because "many black people" live on the south side of Chicago.

Significantly, the United States Supreme Court recently held in *Hernandez v. New York* that disproportionate *intent*, not impact, was the key in evaluating the race-neutrality of the prosecutor's explanation. (*Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 407, 111 S. Ct. at 1867.) "[D]isparate impact should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent, but it will not be conclusive in the preliminary race-neutrality step of the *Batson* inquiry." (*Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 407, 111 S. Ct. at 1867.) "While the disproportionate impact on [the

minority in question] resulting from the prosecutor's criterion for excluding these jurors does not answer the race-neutrality inquiry, it does have relevance to the trial court's decision on" the ultimate question of whether the defendant has established purposeful discrimination. (*Hernandez*, 500 U.S. at ____, 114 L. Ed. 2d at 408, 111 S. Ct. at 1868.) Thus, the Court found an " 'invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another.' " *Hernandez*, 500 U.S. at ____, 114 L. Ed. 2d at 408, 111 S. Ct. at 1868, quoting *Washington v. Davis* (1976), 426 U.S. 229, 242, 48 L. Ed. 2d 597, 608-09, 96 S. Ct. 2040, 2048-49.

In *People v. Baisten* (1990), 203 Ill. App. 3d 64, 560 N.E.2d 1060, the court found the State's reasons to be race-neutral where one juror lived close to the scene of the crime and may have overheard things about the case in the neighborhood. The trial court in that case agreed with the State that there was a danger that "such a juror may infer certain characteristics about the witnesses merely because of where they reside." (*People v. Baisten*, 203 Ill. App. 3d at 72.) The court on appeal similarly rejected the defendant's argument:

> "[Defendant argues that] by excluding [the juror] because she resides near the scene of the crime, the State impermissibly engaged in 'a group-based exclusion' which would effectively eliminate blacks from the jury *simply because they live on the South Side of Chicago, a predominantly black neighborhood.* We recognize the State's concern that a juror who lives in close proximity to the area where the offense took place may overhear certain information about the offense during the pendency of the trial and thereby lose his or her objectivity. [Citations.] Although the fact that [the juror] lives approximately *five miles* from [the crime scene] makes the State's position more tenuous, we cannot say that the trial court's finding that the prosecutors' exclusion of [the juror] was not racially motivated is contrary to the evidence." (Emphasis added.) *People v. Baisten*, 203 Ill. App. 3d at 81, citing *United States v. Andrade* (8th Cir. 1986), 788 F.2d 521; *People v. Hooper*, 133 Ill. 2d at 509-10.

Thus, under the reasoning of *Baisten*, the trial court in the present case was not required to conclude from defendant's assertion of disproportionate impact that the State had a discriminatory purpose in excluding a juror who lived 20 blocks from the scene of the crime and the home of several alibi witnesses.

Moreover, if a juror's residence in the inner city (where the defendant lived, the crime occurred, and alibi witnesses lived) were found to be a racial classification on its face, then a trial judge could never excuse a juror for cause even if convinced that the juror could not be impartial due to his knowledge of the neighborhood. See *Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 407-08, 111 S. Ct. at 1868 (Court finds the fact that a peremptory strike explanation corresponds to a valid for-cause challenge will demonstrate its race-neutral character).

Simply living in a high crime area has often been presented as an explanation for exclusion of a potential juror. One prosecutor stated: "I just asked him to look down my list—and he's lived here for a long time—and pick out what was [*sic*] bad addresses, bad in the sense of high crime areas, areas where we probably would not want jurors for the State who perhaps might be sympathetic with the defendant." *Harrell v. State* (Ala. 1989), 555 So. 2d 263 (remanded to hold a *Batson* hearing). See also, *e.g.*, *People v. Harvey* (1991), 209 Ill. App. 3d 733, 743, 568 N.E.2d 381 (no *prima facie* case established in case where black venireperson was challenged on basis that she lived in high drug crime area and she did not establish eye contact with prosecutor); *People v. Jenkins* (1989), 190 Ill. App. 3d 115, 141, 545 N.E.2d 986 (court holds trial counsel was not ineffective when he did not object on *Batson* grounds at *voir dire* where valid reasons given for the exclusion of potential juror were that he lived in a high-crime area, dressed inappropriately for coming to court and had a cavalier attitude); *Taitano v. Commonwealth* (1987), 4 Va. App. 342, 347, 358 S.E.2d 590, 592-93 (court found it was a clear and specific nonracial reason that the prosecutor was "concerned because [four potential jurors] lived near the defendant or near the scene of the crime, or in areas of 'high crime' generally").

Other courts have found peremptory challenges race-neutral where the challenges were based on the potential juror's residence or employment being near the defendant's or witnesses' residences, or near the scene of the crime. For example, in *People v. Williams* (1988), 177 Ill. App. 3d 787, 532 N.E.2d 1044, the court held it was race-neutral to exclude two black potential jurors where one lived within a block of the place where the offense took place, which was in a "gang area," even though the offense was not gang related, but the defendant and one codefendant were members of street gangs in that area. In that case, the prosecutor was also concerned that the potential juror would react to a transsexual witness who lived in the same area. The other potential juror worked in the vicinity occupied by

defendant's gang and some gang members sought employment at the place where the potential juror helped unemployed persons obtain jobs; and the prosecutor "thought that she did not want to serve"; and her questionnaire showed she had served on a jury but during *voir dire* she stated she never served on a jury. *Williams*, 177 Ill. App. 3d at 789.

In *Williams*, the defendant argued that the State's geographical explanation was pretextual in that the jurors' connection with a gang area was an extraneous concern since gang membership was not an issue in the case. The court found the State's explanation race-neutral, explaining:

"Common life experience teaches us that gang members often protect one another, and consequently the implication that the jurors' safety might be in question is legitimate in this case. Furthermore, experience with criminal trials teaches that a juror's daily association in the neighborhood where the crime occurred would be a common reason for a peremptory challenge with or without gang activities in the area." *Williams*, 177 Ill. App. 3d at 792.

In *People v. Hooper*, one potential black juror was stricken because she resided in an area frequented by a gang to which one of the codefendants belonged. The court commented: "Striking a juror because of geographic proximity to the scene of the crime or to the residence of one of the codefendants has been accepted as a race-neutral and legitimate reason for excusing a prospective juror." *People v. Hooper*, 133 Ill. 2d at 509-10, citing *People v. Williams*, 177 Ill. App. 3d at 792-93.

In *People v. Jones* (1990), 201 Ill. App. 3d 440, 559 N.E.2d 112, the court found to be race-neutral the explanation that one potential juror lived in the same neighborhood as defendant and another juror lived in the same neighborhood as the incident. The court noted that "[t]rial judges are especially well-suited to make this determination because they are familiar with local conditions and prosecutors, and can draw upon their power of observation and judicial experience as a guide in distinguishing a true case of discrimination from a false one." (*People v. Jones*, 201 Ill. App. 3d at 446-47.) The court also noted that the division of neighborhoods in Chicago can encompass a very small area, or an area as large as a square mile or two. *People v. Jones*, 201 Ill. App. 3d at 447. See also *United States v. Davis* (8th Cir. 1989), 871 F.2d 71 (no *Batson* violation found where prosecutor considered residence of venire members because of concern that they

might be within defendant's sphere of influence if they lived in his neighborhood).[1]

In *People v. Hope* (137 Ill. 2d at 471), the court noted that "[w]ith or without a factual basis, the State represented that it had reason to believe that a certain witness could be found near or in the building where [juror] lived." The court deferred to the trial court's finding that the prosecutor's uncontradicted assertion was credible. See also *People v. Harris*, 129 Ill. 2d at 178 (court stated that it might not agree, but found trial court's conclusion not contrary to the evidence where trial court had agreed with State that venireperson could be stricken because she lived in Hyde Park, where residents were more scholarly and open to new ideas and thus would be less likely to base their findings on facts in evidence); *People v. Batchelor*, 202 Ill. App. 3d at 324 (court finds State's explanation that potential black juror resides near home of defendant to be race-neutral reason for exclusion); *People v. Jones* (1990), 201 Ill. App. 3d 440, 559 N.E.2d 112 (court finds State's explanation that potential black juror lived in defendant's neighborhood and another lived in same neighborhood as incident to be race-neutral explanations for exclusion).

The ultimate determinative factor is whether the trial judge chose to believe the prosecutor's race-neutral explanation. The question of intent to discriminate is a "pure issue of fact, subject to review under a deferential standard." *Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869.

> "[T]he decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869, quoting *Wainwright v. Witt* (1985), 469 U.S. 412, 428, 83 L. Ed. 2d 841, 854, 105 S. Ct. 844, 854.

---

[1]But see *Lynn v. Alabama* (1989), 493 U.S. 945, 947, 107 L. Ed. 2d 338, 340, 110 S. Ct. 351, 352 (Marshall, J., dissenting from denial of *certiorari*) ("[m]ere place of residence, or any other factor closely related to race, should not be regarded as a legitimate basis for exercising peremptory challenges without some corroboration on *voir dire* that the challenged venirepersons actually entertain the bias underlying the use of that factor").

Because there are two permissible views of the evidence here, we cannot find that the trial court's choice between them is clearly erroneous. (See *Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d 412, 111 S. Ct. at 1871-72.) Moreover, in addition to the fact that Neely was originally accepted as a juror by the State, the court "could have relied on the facts that" (*Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 412, 111 S. Ct. at 1872) the race of the "victim[ ] and prosecution witnesses tended to undercut any motive to exclude [blacks] from the jury." (*Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 412, 111 S. Ct. at 1872), even though the sameness of race by no means obviates the *Batson* prerequisites. This case does not involve an interracial crime "in which specific racial groups would be prone to take sides of prejudice." *People v. Evans* (1988), 125 Ill. 2d 50, 65-66, 530 N.E.2d 1360.

Thus, the fact that the prosecutor excluded Neely on the basis that he might be influenced due to the address of his home or school, does not leave us "with the 'definite and firm conviction that a mistake has been committed.' " *Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871, quoting *United States v. United States Gypsum Co.*, 333 U.S. at 395, 92 L. Ed. at 766, 68 S. Ct. at 542.

In regard to Neely, defendant argued that Neely was similar in most respects to a white juror, Sutorius, who was also a teacher. Defense counsel argued:

"There was nothing unusual brought out, no contact with the law, no prejudice against law enforcement individuals, Mr. Neely is a teacher residing on the far South Side. I believe he is similar to [*sic*] in most respects to Miss Sutorious who is a teacher, other than his sex and race."

That argument is hardly persuasive in light of the obvious differences in their residence and place of employment, the factors upon which the State's challenge to Neely pivoted. The only common characteristic which the record shows to be shared by these two jurors was their general occupation as teachers. Neely lived, and taught fifth grade, in the inner city, not far from the scene of the crime. In contrast, Sutorious lived in North Lake, Illinois, for 25 years, taught in Franklin Park, Berkley and District 88, far from the scene of the crime. Moreover, the State's rejection of a black venireperson and acceptance of a characteristically similar white member of the venire, even where demonstrated, does not automatically establish with conclusivity that the State's explanations were pretextual. (*People v. Hooper*, 133 Ill. 2d at 511.) The white juror may have exhibited some trait which the State could reasonably believe might make him desirable as a juror. " 'This question and all others involved in the hearing were for the

trial judge, who had also presided at the *voir dire.'*" *People v. Hooper*, 133 Ill. 2d at 511, quoting *People v. Young* (1989), 128 Ill. 2d 1, 23, 538 N.E.2d 453.

■ Defendant's arguments concerning the other two jurors, McGee and Norwood, are really contingent upon his argument concerning Neely. "In light of the prosecutor's specious explanation for excluding Mr. Neely[,] his purported reasons for excluding two other black venirepersons must also be viewed with extreme skepticism." Since we do not find sufficient cause to reverse the trial court's acceptance of the State's reasons for excluding Neely, this bootstrapping argument cannot provide a basis for rejecting the State's reasons for excluding the other two black jurors.

Moreover, the existence of McGee's 12-year-old illegitimate child and her one-year unemployment status could reasonably be considered a neutral reason for dismissing a juror. (See *United States v. Cartlidge* (5th Cir. 1987), 808 F.2d 1064, 1070-71 (reasonable explanation includes fact that prospective juror was single or divorced, in favor of married person, or unemployed, in favor of a professional); *People v. Kindelan* (1991), 213 Ill. App. 3d 548, 572 N.E.2d 1138 (unemployment).) In addition, McGee's landlord, whom she saw frequently, was a Chicago police sergeant.

In regard to Norwood, the prosecutor explained: "Judge I don't believe he was attentive during the questioning, he appeared to be disinterested, he appeared to be sleeping when other people were being questioned." This is a racially neutral reason. See *People v. Harris*, 129 Ill. 2d at 175-76 (juror "meek and sleepy"); *People v. Talley* (1987), 152 Ill. App. 3d 971, 987, 504 N.E.2d 1318 (demeanor of prospective juror is race-neutral reason for excluding him).

Defendant asserts that the trial judge disputed whether Norwood was inattentive. The court commented: "Well, he didn't bother me because he was rather quiet there, I don't know about him." Nothing in this statement indicates an unwillingness on the part of the trial judge to acquiesce in the State's reason for discharging Norwood because he was sleeping.

■ Defendant also contends that the trial court applied the wrong legal standard in denying defendant's *Batson* motion, because the judge "noted twice that there were Latinos left on the jury, and noted once that the defense had excused a juror who may have been black" when these facts are not relevant to a *Batson* challenge. The court remarked, "We have three minorities [on the jury], and one guy, I don't know whether he was black or not that you excused, [defense counsel]." The record does not indicate the judge predicated his ruling

on the reasoning that the presence of minorities on the jury precluded a finding that defendant had established discriminatory intent under *Batson*. (*Cf. People v. Lockhart* (1990), 201 Ill. App. 3d 700, 558 N.E.2d 1345 (trial court used wrong standard where it believed 100% exclusion of blacks was necessary to establish *prima facie* case).) Moreover, we are bound to review the correctness of the trial court's decision and not the correctness of its stated reasons (see *People v. Lockhart*, 201 Ill. App. 3d at 713), particularly where the remark at issue here appeared to be nothing more than a superfluous comment.

Accordingly, we do not find the trial court's determination that no *Batson* violation occurred to be clearly erroneous.

Defendant next contends that he was denied a fair trial by the State's "repeated, unfounded insinuations that [defendant] was a member of a gang." He points to the subsequent cross-examination, after defendant denied being a member of a gang, regarding defendant's knowledge of gang-related activities, and two comments made by the State in closing argument. Defendant has not contended, either here or at trial, that the State did not have some reason to initially raise the issue of gangs. Moreover, neither the trial court nor the defense ever indicated during trial that the mention of gangs, or the attempted development of the issue in cross-examination, was creating undue prejudice to defendant, or outweighing the probative value of the inquiry.

Evidence showing the defendant was a member of a gang or involved in gang-related activity is admissible to provide a motive for an otherwise inexplicable act. (*People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840; *People v. Ayala* (1990), 208 Ill. App. 3d 586, 567 N.E.2d 450.) Evidence of motive is not an essential element of the crime of murder, but it is relevant because it renders more probable that the defendant did kill the deceased. (*People v. Smith* (1990), 141 Ill. 2d 40, 56, 565 N.E.2d 900.) For the evidence to be competent, however, it must tend to establish the existence of the motive at least to a "slight degree." *People v. Smith*, 141 Ill. 2d at 56.

Moreover, where gang affiliation is alleged to be a motive, it must be recognized that, particularly in metropolitan areas, there may be a strong prejudice against street gangs. (*People v. Smith*, 141 Ill. 2d at 58.) Thus, there must be sufficient proof that gang membership or activity is related to the crime charged. (*People v. Hairston*, 46 Ill. 2d at 372.) Membership in a gang may be demonstrated either through a defendant's own admission (*People v. McClendon* (1986), 146 Ill. App. 3d 1004, 497 N.E.2d 849), or by the use of rebuttal evidence in re-

sponse to the defendant's specific denial of membership. *People v. Rivera* (1986), 145 Ill. App. 3d 609, 495 N.E.2d 1088.

Here, the State was unable to sufficiently establish gang membership or activity related to the crime charged. Our concern, however, is whether the State's exploration of the issue on cross-examination was excessive, as urged by defendant.

A defendant who testifies subjects himself to cross-examination, the scope of which rests within the sound discretion of the trial court. (*People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801; *People v. Burris* (1971), 49 Ill. 2d 98, 273 N.E.2d 605.) Reversal is required only where there is a clear abuse of discretion resulting in manifest prejudice to defendant. *People v. Williams*, 66 Ill. 2d 478, 363 N.E.2d 801; *People v. Torres* (1985), 130 Ill. App. 3d 775, 474 N.E.2d 1305.

Moreover, the limitation on the scope of cross-examination is construed liberally to allow inquiry into whatever tends to explain, qualify, modify, discredit, or destroy the testimony on direct. (*People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146; *People v. Williams*, 66 Ill. 2d 478, 363 N.E.2d 801.) In addition, a "good-faith basis is required on the part of examining counsel as to the truth of the matter contained in leading questions propounded to a witness on cross-examination." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §607.3, at 340 (5th ed. 1990), citing, *e.g., People v. Fiorita* (1930), 339 Ill. 78, 170 N.E. 690; *People v. Strong* (1986), 151 Ill. App. 3d 28, 502 N.E.2d 744.

■ We believe that the State had a good-faith basis for exploring on cross-examination of defendant and Henderson the issue of a gang-related motive for the otherwise inexplicable act of defendant shooting randomly into a group of five people. (See *People v. Munoz* (1984), 157 Cal. App. 3d 999, 204 Cal. Rptr. 271 (where similar exploratory questioning was found not to be prejudicial).) John Rice testified for the State, without contradiction, to the following facts. He had been a member of the Cobra Stones, a gang which controlled his building at 4101 South Federal. Of the five men defendant shot at, the two Rice brothers, Sammy Jones and John O'Neal either now live or had previously lived in that building. John Rice testified further that a rival gang, the Disciples, was at war with the Stones. The Disciples controlled the next building, 4037 South Federal. John had seen defendant in the neighborhood. Moreover, the evidence shows that defendant's grandmother, aunt, uncle, cousins and friends, many of whom testified as alibi witnesses, all lived in that building and defendant claims to have been staying in that building during the time of the shooting.

With that evidence having been elicited from a witness for the State, we believe that the State could properly explore the issue with defense witnesses. Thus, it was not error for the State to question Henderson and defendant about gangs.

Moreover, although defendant denied being a member of a gang, upon further questioning he did concede facts that would have provided a good-faith basis for further inquiry. Although the evidence did not eventually rise to the level of justifying the conclusion that defendant was a gang member or that the shooting was motivated by gang rivalry, it was not a clear abuse of the trial court's discretion to permit the State to further explore gang membership in cross-examination of Henderson and defendant.

Defendant admitted he knew "[q]uite a few" Disciples. "I can't count. It's a numerous number. It's a lot of them." Defendant knew that "mostly" Disciples lived at 4037 South Federal (where defendant claimed he was during the shooting and where his alibi witnesses all lived). He knew that Cobra Stones ran 4101 South Federal (where the victim, the Rices and Jones lived). He had seen John Rice at 4101 South Federal. Defendant knew the Disciples and Stones were at war: "I know they be fighting ***." He also testified: "You can go in any one of those [buildings] you want but they fight though, you know. *** Like if you're known over there by the building, you can go in any building you want. Won't nobody mess with you." If you do not know anyone in the building, however, "[t]hey will mess with you if you come over there."

We also find some significance in the fact that the State never mentioned gangs in its opening statement or initial closing argument. Cf. People v. Smith, 141 Ill. 2d at 60-61 (conviction reversed because cumulative prejudicial impact where, without establishing gang membership, the State's theory of gang-related motive was "argued extensively to the jury in closing argument" and focused on the gang issue in opening statement and introduced incompetent evidence of gang-related motive).

Accordingly, we conclude that there was no clear abuse of discretion in permitting the cross-examination of defendant on gang issues. In so finding, we emphasize that any such cross-examination must be terminated when it becomes clear that the State will not be able to elicit sufficient proof to establish a basis from which to infer gang membership. Moreover, even if we were to find that the State's cross-examination extended beyond that threshold, we would find any error to be harmless in view of the strength of the eyewitness testimony supporting defendant's conviction, as discussed below in connection

with defendant's next contention concerning prejudicial gang-related remarks made by the prosecutor in closing argument.

■ Defendant next points to comments made by the State in closing argument. We initially note that it was defense counsel who first raised the issue of gangs during closing argument. In arguing that John Rice had no credibility, counsel stated: "Who are the gangbangers here? John Rice *** said, 'The building I live in and that all my friends live in is controlled by a street gang.' " The defense emphasized: "No one said defendant is in a gang." The defense continued focusing on the issue, exploring why John Rice identified defendant as the shooter: "According to John Rice, everyone in 4037 is a rival gang member. So he picked anyone in the building as a shooter." The defense also argued that it was inconsistent for John Rice, an "admitted gang member" to say he had seen defendant in "another gang['s] building."

Given that it was defense counsel who focused on these gang-related issues, it might have been proper for the State to make some comment in rebuttal. Defendant points to the State's closing rebuttal argument, where the prosecutor said:

"What else did he tell you, ladies and gentlemen? That that park at 4200 on South State Street is a Disciple park. And you'll get this picture back there, ladies and gentlemen, and you'll get to see the back of the field house as it looks out at State Street and you'll get to look at something real interesting. All that graffiti on the wall there.

You know what else I find interesting? *** He doesn't seem to have any problems there. The gang graffiti on the wall. Does that tell you a little something about him? Doesn't that show you the kind of person he is?"

We agree with defendant that this rebuttal argument was improper. While defense counsel made remarks in his closing argument that would have justified some refutation of how Rice's past membership in a gang affected his credibility, it did not justify remarks alluding to defendant's gang membership.

We go on, however, to determine whether or not such error requires reversal.

Here, we can safely conclude that a trial without the error would produce no different result. (See *People v. Parmly* (1987), 117 Ill. 2d 386, 512 N.E.2d 1213.) Any error was harmless because defendant's guilt was established by overwhelming evidence. (See *People v. Wilkerson* (1981), 87 Ill. 2d 151, 157, 429 N.E.2d 526.) On appeal, defendant has not raised the issue of whether the evidence was suffi-

cient to establish his guilt beyond a reasonable doubt. We find, however, that the evidence was more than sufficient.

■ Tony Rice observed defendant begin shooting from a distance of only 25 feet, in daylight. Tony then lay behind a car and, with an unobstructed view, watched as defendant continued firing the gun. Tony had seen defendant three or four times previously in the neighborhood and recognized him. On the night following the shooting, Tony rode with police officers and identified defendant on the street. He also identified defendant at trial. Tony had no criminal record.

John Rice also observed defendant during the shooting itself and recognized him from the neighborhood. Without speaking with his brother Tony, John identified defendant in a lineup at the police station. John also identified defendant at trial.

Both eyewitnesses described defendant to the police as being 5 feet 9 inches tall, with shoulder-length, slicked back hair, wearing blue jeans and a gray leather jacket. John said defendant weighed 150 to 160 pounds; Tony said he was "thin." Tony added that defendant had a light moustache. Consistent with these descriptions, defendant described himself as being 5 feet 9 inches tall, weighing 145 pounds, wearing his hair long and slicked back, and having a moustache at the time of the shooting.

This identification testimony was sufficient to support defendant's conviction.

In his defense, defendant relied on Officer Scannell's testimony that there were three offenders. However, there was some confusion about that and the jury was not required to place any weight on that testimony. (In fact, the presence of three offenders, all wearing their hats "to the right," and shouting out something before shooting might have lent some credence to a gang-related motive.) Moreover, even if defendant had been accompanied by two other men, it did not weaken the eyewitness testimony describing defendant as the shooter.

Defendant also relied on Jackson's testimony that he saw a husky male run from the scene. Jackson, however, testified that he never saw the shooter. Instead, he saw a dozen people on the street, and after hearing shots fired, he looked over and noticed several people running, including a husky male with short hair. Moreover, Jackson's testimony was undermined by his statement that the shooting occurred at 4 or 4:30 p.m. when it was actually almost 7 p.m.

Defendant relies most strongly on his alibi witnesses. Even disregarding Officer Murphy's rebuttal testimony, the alibi testimony offered by defendant was seriously undermined by contradictions among the alibi witnesses.

Defendant says he slept at Henderson's on September 12; went to his grandmother's next door at 7 a.m., and stayed all day with William Henderson waiting for his girl friend. William Henderson testified to the contrary in regard to the time he spent with defendant. Defendant stated further that at 5 p.m., he was in Fred's apartment with William, Fred and Tessie, watching television. A little after 6 p.m., he heard a shot and went onto the porch with William and Fred. Scanlon's testimony contradicted this. Defendant stated on direct that William, George, Fred and Fannie were on the porch. On cross-examination, he first stated that these people, plus Tessie, were on the porch. Then he added that a few of Fred's friends were on the porch. Finally, he added that his cousin Calvin was also on the porch. Other defense witnesses disagreed on these facts. Contrary to William's testimony, defendant stated that he left the building before 11 p.m.

Thus, defendant's alibi evidence regarding whom he was with, where he was, and what he was doing before, during and after the shooting, was replete with contradictions.

We conclude that the evidence in this case strongly supported defendant's conviction. The trial, even absent the improper closing argument by the State, would not produce a different result.

Defendant next contends that he was denied a right to a fair trial due to "repeated instances of prosecutorial misconduct, coupled with extensive prosecutorial overreaching." Defendant points to five instances of alleged misconduct and overreaching.

■ Defendant asserts that it was prejudicial for the prosecutor to inform the jury in opening statement that motive "is something that the People of the State never have to prove." Defendant's objection was overruled. This issue was not raised in defendant's post-trial motion and thus has been waived. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.) Moreover, the scope of opening statements is within the trial court's discretion (*People v. Rader* (1988), 178 Ill. App. 3d 453, 462, 532 N.E.2d 1365), and the jury was twice instructed by the court that opening statements are not evidence (*People v. Vasquez* (1969), 118 Ill. App. 2d 66, 71, 254 N.E.2d 617). We see nothing in the record here to indicate that the remark made in opening statement influenced the jury in a manner resulting in substantial prejudice to defendant. (See *People v. Vasquez*, 118 Ill. App. 2d at 71.) Moreover, the plain error rule (134 Ill. 2d R. 615(a)) does not apply here, where the evidence was not closely balanced. Finally, the State is not required to prove motive in a murder case. *People v. Smith*, 141 Ill. 2d at 56.

■ Defendant next maintains that it was prejudicial for the State to argue in its rebuttal argument that defendant could have subpoenaed Tony Pierce as a witness, and that the State had no reason to call him because he never saw the shooter. The remark in question was invited by defense counsel's repeated remarks during closing argument suggesting that Pierce described three offenders to the police but was never called by the State as a witness. See *People v. Wheeler* (1955), 5 Ill. 2d 474, 485-86, 126 N.E.2d 228 (where defense counsel has argued that the State did not produce a witness, the prosecutor may reply on rebuttal that defense counsel could have produced the same witness).

■ Defendant next argues it was error for the State to use a leading question during redirect examination of Tony Rice regarding the defense of alibi. The State asked: "Mr. Rice, when you saw the defendant come out from behind the field house, that's not the first time you saw him, is it?" A defense objection, without specification of grounds, was overruled. The State then rephrased the question: "Had you ever seen the defendant before he came out from the side of the field house?" We find no substantial injury to defendant resulted from this single question, particularly in view of the strong eyewitness testimony, and the prosecutor's immediate withdrawal of, and rephrasing of, the question. See *People v. Camden* (1980), 91 Ill. App. 3d 946, 414 N.E.2d 823 (error of single leading question promptly cured by State's withdrawal of question).

Defendant next argues that the State erroneously was permitted to perfect the impeachment of defendant through the testimony of Officer Murphy on purely collateral matters. On rebuttal, Murphy offered testimony contradicting defendant's testimony regarding how defendant spent the day in the hours leading up to the time of the shooting.

The latitude to be allowed on rebuttal is a matter within the sound discretion of the trial court, and that judgment will not be disturbed on appeal unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Peter* (1973), 55 Ill. 2d 443, 451-52, 303 N.E.2d 398.) A matter is not collateral where it could be independently introduced for a purpose other than to contradict. *People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267.

In *Collins*, our supreme court upheld the trial court's ruling in permitting rebuttal testimony, and rejected defendant's argument that the impeachment concerned collateral matters. Defendant Collins testified that on November 12, the day of the murders, he was with his

girl friend. His girl friend testified similarly. On cross-examination, however, she testified that on November 9 she went to a Kung Fu movie with defendant at a certain theater. In rebuttal, the State called the theater's manager, who testified that no Kung Fu movie was shown on November 9. The court found no abuse of discretion in permitting this rebuttal testimony. *People v. Collins*, 106 Ill. 2d at 270, citing *People v. Byer* (1979), 75 Ill. App. 3d 658, 394 N.E.2d 632; E. Cleary, McCormick on Evidence §47 (3d ed. 1984).

*People v. Byer* recites the same test for defining "collateral" matters and adds McCormick's broader test:

> "Suppose a witness has told a story of a transaction crucial to the controversy. To prove him wrong in some trivial detail of time, place or circumstance is 'collateral.' But to prove untrue some fact recited by the witness that if he were really there and saw what he claims to have seen, he could not have been mistaken about, is a convincing kind of impeachment that the courts must make place for, although the contradiction evidence is otherwise inadmissible because it is collateral under the tests mentioned above. To disprove such a fact is to pull out the linchpin of the story. So we may recognize this third type of allowable contradiction, namely, the contradiction of any part of the witness's account of the background and circumstances of a material transaction, which as a matter of human experience he would not have been mistaken about if his story were true. This test is of necessity a vague one because it must meet an indefinite variety of situations, and consequently in its application a reasonable latitude of discretionary judgment must be accorded to the trial judge." E. Cleary, McCormick on Evidence §47, at 111-12 (3d ed. 1984), quoted in *People v. Byer*, 75 Ill. App. 3d at 669.

■■ In the present case, under the rationale of *Collins*, the extrinsic testimony here was material in so far as it tended to rebut defendant's alibi defense. The case of *People v. Deal* (1935), 361 Ill. 225, 197 N.E. 772, is in point. There, the court found the State's evidence admissible to contradict defendant's alibi where the robbery occurred at 9 p.m.; defendants' alibi evidence concerned their whereabouts from 4 p.m. until midnight; and the State's evidence in rebuttal concerned the location of defendants at 7:30 p.m. and 11:30 p.m. The court held "it was all properly admitted to refute the alibi testimony which preceded it." (*Deal*, 361 Ill. at 230.) Finally, " '[i]t was competent to show in contradiction of the testimony of the defendants and of their evidence of an alibi, that they were in Mul-

berry Grove on the occasion in question.' " *Deal,* 361 Ill. at 230, quoting *People v. Deal* (1934), 357 Ill. 634, 641, 192 N.E. 649, *later appeal* (1935), 361 Ill. 225, 197 N.E. 772.

Similarly, in *People v. Mannen* (1977), 46 Ill. App. 3d 61, 360 N.E.2d 563, the court found testimony from the State's two rebuttal witnesses to be admissible to contradict defendant's alibi, which was limited to the time between 6:45 p.m. and 1 a.m. The State's inquiry on cross-examination went to defendant's activities earlier that afternoon; and the State's rebuttal witnesses testified about defendant's location at 3:30 that afternoon. The court found the time span was "not so remote in time as to constitute a collateral matter or to be irrelevant." (*Mannen,* 46 Ill. App. 3d at 63-64.) It concluded that the challenged "cross-examination and rebuttal evidence discredited defendant's assertions that he had not taken part in the robbery and his alibi defense." (*Mannen,* 46 Ill. App. 3d at 64.) The court continued: "Questioning him on the topic of the afternoon meeting before the robbery certainly questions defendant's credibility which was put in issue by his direct denial of facts testified to earlier by witnesses for the State. Defendant put his own credibility in issue by taking the stand and contradicting the State's evidence." *Mannen,* 46 Ill. App. 3d at 64. See also *People v. Lenhardt* (1930), 340 Ill. 538, 173 N.E. 155 (evidence admissible to contradict defendant's alibi, covering time span of several days); *People v. Olbrot* (1969), 117 Ill. App. 2d 366, 254 N.E.2d 569. See generally 14A Ill. L. & Prac. *Criminal Law* §267, at 192 (1968 and Supp. 1991) ("In rebuttal, the prosecution may prove any other fact which tends to contradict accused or to disprove the alleged alibi").

We therefore conclude that the trial court did not clearly abuse its discretion in permitting Officer Murphy to testify in rebuttal. Moreover, even if the extrinsic impeachment testimony offered by Murphy was not otherwise admissible, we would find any error harmless in view of the overwhelming evidence supporting defendant's conviction, which we have previously discussed and analyzed.

 Defendant next maintains it was improper for the prosecutor, while cross-examining defendant, to insinuate defendant had lied to the police by asking defendant whether he had "told the police officers a third *story.*" Although the State would have been better served by using a word that carried a less pejorative connotation, we nevertheless hold that no error occurred, particularly where it only amounted to a single word in a lengthy cross-examination, and where the trial court was in the best position to hear the tone of voice and demeanor used by the prosecutor. See *People v. Grodkiewicz* (1959),

16 Ill. 2d 192, 199, 157 N.E.2d 16 (State's Attorney's remark, if improper, was brief and of little significance).

■■■ Defendant finally contends that the trial court abused its discretion in refusing to give the jury either defense-tendered instruction on the reliability of eyewitness identification. The first instruction addressed the reliability of eyewitness identification based on *United States v. Hodges* (7th Cir. 1975), 515 F.2d 650. The second instruction was based on Illinois Pattern Jury Instructions, Criminal, No. 1.02 (2d ed. 1981) (IPI Criminal 2d). This court has found that IPI Criminal 2d Nos. 1.02 and 2.03 are adequate for the jury to judge the credibility of identification testimony. (*People v. Hirschmann* (1988), 175 Ill. App. 3d 150, 529 N.E.2d 760.) Both of these instructions were given here. Moreover, it is recommended that special instructions on eyewitness identification not be given. (IPI Criminal 2d No. 3.15, Committee Note; *People v. Hirschmann*, 175 Ill. App. 3d 150, 529 N.E.2d 760.) The trial court did not abuse its discretion in refusing defendant's instructions.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

LORENZ, P.J., and MURRAY, J., concur.