THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
J.B. BOSTON, Defendant-Appellant.

First District (4th Division) No. 1—89—1592

Opinion filed December 5, 1991.—Rehearing denied February 4, 1992
and *pro se* rehearing denied February 6, 1992.

JOHNSON, J., dissenting.

Michael J. Pelletier and James E. Chadd, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Guy L. Miller IV, and Sandra Z. Nueschen, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial, the defendant J.B. Boston was convicted of rape, armed robbery and home invasion and sentenced to natural life imprisonment for each offense. He appealed raising various issues including whether the prosecutor's use of peremptory challenges against black members of the venire violated the defendant's right to due process and equal protection of the law. Based on the United States Supreme Court decisions in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, and *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, which held that *Batson* applies to all cases pending on direct review at the time it was decided, we remanded the cause for a hearing on whether potential jurors had been excluded because of their race. Following the hearing, the trial court determined that the defendant failed to establish a *prima facie* case of discrimination. The defendant contends on appeal that the trial court's finding was against the manifest weight of the evidence and that the court erred in considering race-neutral explanations offered by the prosecutor prior to determining whether a *prima facie* case of discrimination had been established.

The record discloses that at the conclusion of jury selection, after both the defense and the State had exercised all of their challenges, defense counsel asked the court to dismiss the venire because the prosecutor systematically excluded black venire members by the exercise of six of its seven peremptory challenges. The court denied the motion, noting that three black women were on the jury and that the two alternate jurors were black.

On remand, the trial court stated that the hearing would follow the two-step procedure established in *Batson*. First, the defendant would have to establish facts giving rise to a *prima facie* case of discrimination; second, if the defendant succeeded in establishing a *prima facie* case, the prosecutor would be required to come forward with neutral explanations for the use of his peremptory challenges.

The State and the defendant then agreed that the jury had been composed of three blacks, one Hispanic, one Asian and seven whites. Both alternate jurors were black. The record does not disclose the racial identities of the entire venire. The parties agreed that the State used its eight peremptory challenges to exclude seven blacks and one white. Defense counsel then sought to question Arthur Neville, the prosecutor who exercised the peremptory challenges. The State objected on the basis that the prosecutor is not required to offer race-neutral explanations for the use of his challenges until the defendant first establishes a *prima facie* case of discrimination. Defense counsel responded that his questions would relate solely to issues relevant to the establishment of a *prima facie* case of discrimination. However, before any questioning took place, the defendant elected to proceed *pro se*.

After the trial court admonished the defendant concerning the consequences of his decision to proceed without counsel, the defendant argued at length regarding the characteristics of the jurors and the excluded venire members. The defendant then questioned the prosecutor, over an objection by the State, as to his reasons for excluding certain jurors. Both sides presented arguments, with the prosecutor giving rather detailed explanations to justify the exclusion of the seven black venire members. The court then made the following comment:

> "I know Mr. Neville from many trials that he tried here. I know his partner, Mr. Webber, who is now a judge from the many trials that he has tried here, and I know that at least in appearances, any statements that they have ever made during the course of working in this courtroom, that neither of those gentlemen have ever expressed, have ever shown any partiality one way or another, because of a person's race. I have never heard Mr. Neville express any type of statements that would in any way indicate any bias or prejudice on his part concerning a person's race ***."

The court at that point asked Arthur Neville to give some of the reasons he had for excluding jurors in this cause. According to the court, the explanation would assist the court in determining whether the

defendant had established a *prima facie* case of discrimination and would also serve to complete the record for appellate review. Neville then explained in very general terms that he tended to exclude jurors who were very religious or who lived in the same general area as the defendant. He also mentioned evasiveness in responding and lack of ties to the community as possible reasons for exclusion.

The court then made a finding that the defendant failed to establish a *prima facie* case of discrimination. The court noted that 25% of the jury, not including the alternates, was black and that two of the other jurors were members of minority groups. It further stated that the seven blacks peremptorily challenged constituted a homogeneous group in that none were crime victims or had any brush with criminal activity. The court stated:

> "It is obvious that the State was looking for people, if they could find them, who had some understanding of being the victim of a crime. Most, if not all of the jurors, most of the jurors who were, in fact, selected had this characteristic which was different and separate from the characteristic of any of the jurors who were excluded."

The court then reviewed the explanations given by the prosecutor and determined that the peremptory challenges were exercised for race-neutral reasons. The court noted that one juror was excused because he stated that he was worried about his job, and another was excused because he did not fill out the back of the jury card. The court further stated that certain jurors were excused because of their religious or charitable activities. Others lived in the area where the criminal investigation occurred. The court concluded that "I don't believe, under the circumstances, and my knowledge of the work of Mr. Neville and Mr. Webber that there was any selection in this case that had anything to do with race; that they were non-racial reasons."

On appeal, the defendant contends that the trial court erred both in its manner of conducting the *Batson* hearing and in its finding that a *prima facie* case of discrimination had not been established.

With regard to the procedural issue, the defendant contends that the court acted improperly in considering the explanations offered by the State before ruling upon whether the defendant met his burden of establishing a *prima facie* case.

In *People v. Hope* (1990), 137 Ill. 2d 430, 560 N.E.2d 849, the Illinois Supreme Court stated that *Batson* envisioned a methodical step-by-step application for judging whether purposeful discrimination has occurred. Under this analysis, the court would first assess whether the defendant had established a *prima facie* case of discrimination;

next, the court would consider the prosecutor's explanations in determining whether or not the peremptory challenges were exercised in a race-neutral manner. The court in *Hope* cautioned against collapsing the *Batson* analytical steps into "an undifferentiated review of defense contentions and prosecutorial explanations." *Hope*, 137 Ill. 2d at 456, 560 N.E.2d at 860.

However, in *Hope v. Illinois* (1991), 501 U.S. 1202, 115 L. Ed. 2d 966, 111 S. Ct. 2792, the United States Supreme Court granted the defendant's writ of *certiorari*, vacated the judgment in *Hope* and remanded the cause to the Illinois Supreme Court for further consideration in light of *Hernandez v. New York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859. *Hernandez* involved a situation in which the trial court heard the race-neutral explanations offered by the prosecutor and ruled on the ultimate issue of intentional discrimination without first determining whether the defendant had established a *prima facie* showing of discrimination. In assessing the impact of the procedure followed in the trial court, the Supreme Court in *Hernandez* stated that "[t]his departure from the normal course of proceeding need not concern us. *** Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot." (Emphasis added.) *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.

■ In the case at bar, the trial court ruled that based on the circumstances of the case and his experiences with the prosecutors, the State's peremptory challenges were exercised for race-neutral reasons. Under the reasoning of *Hernandez*, the preliminary issue of whether the defendant had made out a *prima facie* showing of discrimination became moot. (*People v. Johnson* (1991), 218 Ill. App. 3d 967, 578 N.E.2d 1274.) Therefore, the only question remaining is whether the trial court erred in finding that no discrimination occurred.

■ Once the prosecutor offers a race-neutral reason for his exercise of peremptory challenges, it becomes the duty of the trial court to determine whether the defendant has established purposeful discrimination. (*Batson v. Kentucky* (1986), 476 U.S. 79, 98, 90 L. Ed. 2d 69, 88-89, 106 S. Ct. 1712, 1723-24.) "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (*Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.) The *Hernandez* Court, citing *Batson*, explained that "the trial court's decision on the ultimate question of dis-

criminatory intent represents a finding of fact of the sort accorded great deference on appeal." (*Hernandez*, 500 U.S. at 364, 114 L. Ed. 2d at 408-09, 111 S. Ct. at 1868.) The trial court's decision will not be reversed unless the reviewing court is left with a " 'definite and firm conviction that a mistake has been committed.' " *Hernandez*, 500 U.S. at 370, 114 L. Ed. 2d at 412-13, 111 S. Ct. at 1872, quoting *United States v. United States Gypsum Co.* (1948), 333 U.S. 364, 92 L. Ed. 746, 68 S. Ct. 525.

■ In the instant cause, the trial court based its finding of no discrimination primarily upon its observation that none of the excluded black jurors had been victims of crime or had friends or family who had been victims of crime. The record reveals that seven of the jurors who had been selected and one of the alternate jurors had either been victims of crime or had friends or family who were crime victims. The trial court noted that it was obvious that the State was looking for jurors "who had some understanding of being the victim of a crime." The defendant maintains that this shared characteristic does not reflect the real reason that the black venire members were excused because there were members of the panel, both black and white, who were not victims of crime. However, as stated in *People v. Young* (1989), 128 Ill. 2d 1, 23, 538 N.E.2d 453, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 798, 110 S. Ct. 3290, the fact that a characteristic shared by the excluded black jurors was possessed by some white jurors who were not challenged does not in and of itself mean that the reason for exclusion was pretextual. The court noted that the jurors who were chosen "may have, in some other respect, exhibited a trait which the prosecutor reasonably could have believed would make him or her desirable as a juror." *Young*, 128 Ill. 2d at 23-24, 538 N.E.2d at 458-59.

■ The trial court also relied heavily upon its knowledge of the prosecutor who selected the jury. As quoted earlier, the court stated that it had extensive experience working with that prosecutor and did not believe that the prosecutor's exclusion of jurors was based on race. In *People v. Mahaffey* (1989), 128 Ill. 2d 388, 414, 539 N.E.2d 1172, *cert. denied* (1989), 493 U.S. 873, 107 L. Ed. 2d 156, 110 S. Ct. 203, the Illinois Supreme Court held that it was proper for the trial court to use its experience, as well as its superior knowledge of local conditions and prosecutors, in determining whether the State's peremptory challenges were motivated by discrimination. The court therefore acted within its discretion in considering its knowledge of and prior experience with the prosecutors in the instant cause as a

factor in determining whether the peremptory challenges were motivated by discrimination.

■■ Based on our review of the above factors, we are not left with a "definite and firm conviction that a mistake" was committed by the trial court in finding as a matter of fact that no discrimination occurred in the selection of the jury. (*Hernandez*, 500 U.S. at 370, 114 L. Ed. 2d at 412, 111 S. Ct. at 1872.) A common theme running through the cases addressing the *Batson* issue is the considerable discretion vested in the trial court. (See *People v. Young* (1989), 128 Ill. 2d 1, 21, 538 N.E.2d 453; *People v. Evans* (1988), 125 Ill. 2d 50, 66, 530 N.E.2d 1360, *cert. denied* (1989), 490 U.S. 1113, 104 L. Ed. 2d 1036, 109 S. Ct. 3175.) As stated in *Evans*:

> "[W]e must keep in mind that the initial determination of whether a *prima facie* case has been established is left to the judgment of the trial judge, who is in a superior position to determine whether the prosecutor's exercise of peremptory challenges was motivated by group bias. *** Trial judges are especially well suited to make this determination because they are familiar with local conditions and prosecutors, and can draw upon their power of observation and judicial experience as a guide in distinguishing a true case of discrimination from a false one." (*Evans*, 125 Ill. 2d at 66-67, 530 N.E.2d 1366-67.)

Based on the foregoing reasoning, we do not believe that the trial court erred in finding that no discrimination occurred.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McMORROW, J., concurs.

JUSTICE JOHNSON, dissenting:

I am cognizant that the trial court's decision as to whether defendant has established purposeful discrimination is given great deference. However, after a review of the record, I am left with a definite and firm conviction that a mistake has been made in this case. (*Hernandez v. New York* (1991), 500 U.S. 352, 370, 114 L. Ed. 2d 395, 412-13, 111 S. Ct. 1859, 1871-72.) Therefore, I respectfully dissent.

The State must give a clear and reasonably specific explanation of its legitimate reasons for exercising its peremptory challenges. (*Batson v. Kentucky* (1986), 476 U.S. 79, 98 n.20, 90 L. Ed. 2d 69, 88 n.20, 106 S. Ct. 1712, 1724 n.20.) I believe the majority opinion errs in stating that the prosecutor gave a detailed explanation to justify

the exclusion of seven out of eight African-American venire members. After the trial judge postulated reasons for excluding the seven venire members, he then asked the prosecutor to give some reasons he had for the exclusions. The majority correctly recognized that at that point the prosecutor "explained in very general terms" why he excluded the African-American venire members.

The State contends the "initial characteristic" which the excluded venire persons had in common was that they all lived on the south side of Chicago. The State reasons: "The potential exists that jurors who become aware during trial that they live in defendant's neighborhood may become fearful of retaliation and would, therefore, be preoccupied and uncooperative." The trial court also found that "people who live in a particular area may actually know more about the case than the jurors are supposed to know."

I find this logic, as applied to the facts in this case, to be absurd. The incident occurred on the north side of Chicago. The venire persons resided anywhere from the near south side of Chicago to the far southern suburb of Harvey, Illinois. The south side of Chicago encompasses a significant area within the Chicago city limits; to apply the trial court's logic would mean that everyone living on the south side of Chicago would have more than a passing knowledge of this case. Furthermore, using the State's rationale, all persons residing on the south side would be fearful of retaliation by someone who lived not even remotely near them. This reasoning would be more applicable to persons living within defendant's immediate community or the community in which the incident actually occurred.

Notwithstanding the impropriety of this rationale, what I find most disturbing is that I have heard this same general explanation from the State time and time again as to why certain persons of African-American descent are excluded by peremptory challenges. While the State's explanation may have been legitimate in certain limited instances, it is certainly inappropriately applied to the facts in the instant case.

The second reason the State offered for its exclusion of three of the venire persons was that they were active in religious or charitable organizations. The trial court observed that such people have "a propensity towards seeing the best in people, instead of seeing the worst in people, or seeing the truth in people." However, after reviewing the record, I find that 5 of the 12 jurors admitted to being active with their church. Furthermore, the State did not ask the jurors with what organizations they were affiliated on a consistent basis. Contrary to

what the State now argues, I find that there was no true concern with excluding persons active with religious organizations.

Additionally, as defendant observes, the State at the *Batson* hearing did not provide explanations for each of the potential jurors it excused. The State has not met its burden of providing "clear and reasonably specific" explanations of its "legitimate reasons" for exercising the challenges. (*Batson v. Kentucky* (1986), 476 U.S. 79, 98 n.20, 90 L. Ed. 2d 69, 88 n.20, 106 S. Ct. 1712, 1724 n.20.) Moreover I find that the prosecutor's stated reasons for the exclusions were merely a pretext for the base indignity of racial discrimination.

I also believe the trial court failed to "give appropriate weight to the disparate impact of the prosecutor's criterion in determining whether the prosecutor acted with a forbidden intent." (*Hernandez v. New York* (1991), 500 U.S. 352, 353, 114 L. Ed. 2d 395, 401, 111 S. Ct. 1859, 1863.) In determining whether discriminatory intent exists, the following factors should be considered: "[A] 'pattern' of strikes against black jurors; *** [citation]; the disproportionate use of peremptory challenges against blacks [citations]; the level of black representation in the venire as compared to the jury [citations]; [and] whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic [citations]; ***." *People v. Evans* (1988), 125 Ill. 2d 50, 63-64.

"If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination." (*Hernandez*, 500 U.S. at 363, 114 L. Ed. 2d at 408, 111 S. Ct. at 1868.) " '[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact *** that the [classification] bears more heavily on one race than another.' " *Hernandez*, 500 U.S. at 363, 114 L. Ed. 2d at 408, 111 S. Ct. at 1868, quoting *Washington v. Davis* (1976), 426 U.S. 229, 242, 48 L. Ed. 2d 597, 608-09, 96 S. Ct. 2040, 2048-49.

In the instant case, as defendant observed, the State peremptorily challenged six of the nine African-American venire members tendered by the defense, whereas the State only challenged one of the white venire members tendered by the defense. The State also used 87% (seven out of eight) of its peremptory challenges to exclude African-Americans. Clearly, there was a disproportionate use of peremptory challenges against African-Americans.

Evidence of racial discrimination was also apparent in the heterogeneity of the excluded African-American jurors. As defendant notes,

the excluded African-American jurors included both males and females of varying marital status. The range in age was from 23 to 59 years of age and their occupations were varied. It appears that the only characteristic shared by all of these particular venire persons was their race.

While we acknowledge that "the mere number of black venire members peremptorily challenged, without more, will not establish a *prima facie* case of discrimination[ ]" (*People v. Garrett* (1990), 139 Ill. 2d 189, 203), the number of African-Americans excluded still remains a significant indicia of discriminatory practices. Disparate impact is evidence of discriminatory purpose. (See *Arlington Heights v. Metropolitan Housing Development Corp.* (1977), 429 U.S. 252, 265-66, 50 L. Ed. 2d 450, 464-65, 97 S. Ct. 555, 563-64; *Washington v. Davis* (1976), 426 U.S. 229, 242, 48 L. Ed. 2d 597, 609, 96 S. Ct. 2040, 2048.) The number of African-Americans excluded is "unquestionably very relevant to establishing defendant's case, because, justifiably or not, it represent[s] a gross racial imbalance in jury selection." *People v. Hope* (1990), 137 Ill. 2d 430, 464.

I believe that the disproportionate use of peremptory challenges against the African-American venire members, coupled with the fact that the excluded African-American venire members were of a heterogeneous group, creates a strong presumption of purposeful discrimination in this case. Moreover, I believe the totality of all the relevant facts conclusively established that the prosecutor acted with invidious discriminatory purpose.

The relatively unfettered power to exclude African-American jurors is one of the most effective means of practicing racial discrimination in the criminal justice system. The practice of racial discrimination under the guise of "trial strategy" has a profound effect on not only the defendant but also the excluded venire persons. The Supreme Court recently explained this phenomena in *Powers v. Ohio*:

> "Both the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom. A venireperson excluded from jury service because of race suffers a profound personal humiliation heightened by its public character. The rejected juror may lose confidence in the court and its verdicts, as may the defendant if his or her objections cannot be heard. This congruence of interests makes it necessary and appropriate for the defendant to raise the rights of the juror. And, there can be no doubt that petitioner will be a motivated, effective advocate for the excluded venirepersons' rights. Petitioner has much at stake in proving that

his jury was improperly constituted due to an equal protection violation, for we have recognized that discrimination in the jury selection process may lead to the reversal of a conviction." *Powers v. Ohio* (1991), 499 U.S. 400, 414, 113 L. Ed. 2d 411, 427, 111 S. Ct. 1364, 1372.

The judiciary must cease endorsing discriminatory "trial tactics." As I stated in my special concurrence in *People v. Loggins* (1985), 134 Ill. App. 3d 684:

> "A criminal trial is a public event whose significance reaches beyond the truth or falsity of the accusation. A trial includes the ceremonial trappings of history, the appearance of justice, and the participation of citizens in passing judgment. Our entire society, therefore, is represented at a criminal trial. [Citation.]
>
> \*\*\*
>
> \*\*\* [There is an] appearance of injustice when courts appear to condone racial discrimination through the prosecutor's use of peremptory challenges. As Chief Justice Robert N.C. Nix of the Pennsylvania Supreme Court asked in his dissenting opinion in *Commonwealth v. Martin* (1975), 461 Pa. 289, 299, 366 A.2d 290, 295, '[i]s justice to sit supinely by and be flaunted in case after case before a remedy is available? Is justice only obtainable after repeated injustices are demonstrated? Is there any justification within the traditions of the Anglo-Saxon legal philosophy that permits the use of presumption to hide the existence of an obvious fact?' The judiciary must stop this discrimination in its courts to avoid appearing to be an accomplice to it." *Loggins*, 134 Ill. App. 3d at 698.

We must not be an accomplice to a discriminatory jury selection process. After reviewing the record, I find that defendant has clearly established a case of purposeful discrimination. The trial court's finding was clearly erroneous. For the foregoing reasons, I would reverse the decision of the trial court.