FIRST DIVISION
FEBRUARY 04, 2008

No. 1-06-2667

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 16482 |
| | ) | |
| JAMES SIPP, | ) | Honorable |
| | ) | James D. Egan, |
| Defendant-Appellant. | ) | Judge Presiding. |

## MODIFIED ON DENIAL OF REHEARING

JUSTICE ROBERT E. GORDON delivered the modified opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant James Sipp was convicted of the first-degree murder of Demetrick Wright and sentenced to 45 years in the Illinois Department of Corrections. Defendant's posttrial motion for a new trial was denied. On appeal, defendant argues that the trial court erred by (1) denying defendant's requests for an involuntary manslaughter instruction and (2) for a second-degree murder instruction, (3) denying defendant's *Batson* motion, (4) refusing to permit defendant's sister to testify at trial, and (5) sustaining certain objections made by the State with no articulated basis for those objections. We affirm.

### BACKGROUND

On June 8, 2003, defendant's seven-year-old daughter, Jacinta Sipp, was riding her bicycle in the vicinity of defendant's home, located on North Monticello Avenue in

Chicago. Defendant sat on the porch of his home while his daughter rode her bicycle. Defendant testified that as he observed his daughter, an acquaintance from the neighborhood, known only to defendant as K.Y., approached and advised him that the victim had noticed Jacinta riding her bicycle and stated, "[S]omething bad might happen to her."

Defendant testified that he interpreted the victim's statement to be a threat to the safety of his daughter. Defendant knew the victim because defendant's sister, Keana, had dated him several years earlier. Defendant testified that he took the victim's threat seriously because the victim had beaten his sister during that relationship. One beating led to Keana's hospitalization. Defendant also stated that the victim was a known drug dealer, and he believed the victim carried a firearm and was dangerous.

Soon thereafter, defendant drove his daughter to Tennessee, taking her out of school to do so. Defendant immediately drove back to Chicago and then departed on a job for a moving company. A couple of days later, defendant returned to Chicago to work a shift at his second job at a local hardware store.

Defendant testified that he customarily carried a firearm in his car for protection. He testified that his work as a mover frequently took him out of town and he was usually paid in cash. The firearm was a semi automatic 9-millimeter, with a 17-round magazine that was full on June 12, 2003.

Defendant left his home between 10 and 11 p.m. on June 12, 2003. Upon driving away from his residence, defendant observed the victim and several others near a local

liquor store. Angelica Barber, Gary Young, John Powell, and Renardo Gray were among those in the company of the victim. Defendant testified that upon seeing the victim he formulated a plan to "send some warning shots to let them know that [he] was willing to protect [his] family." He testified that he was going to fire warning shots to demonstrate that he and his family were not going to move or be scared out of the neighborhood by the victim or his friends.

Defendant then drove into the parking lot of the liquor store, exited his vehicle and unsuccessfully attempted to locate the victim. He then returned to his automobile and drove around the block into an alley, located behind the liquor store, west of North Monticello. Defendant parked his vehicle in the alley, exited, took a few steps east toward Monticello, and visually located the victim. According to defendant's testimony, the victim was to the east of the alley, facing north, with his left side to defendant. Defendant was to the west of the victim.

Defendant fired four shots in the general direction of the victim and the others in defendant's company. Angelica Barber was shot in the arm, and the victim was shot in the back. The victim died from the gunshot wound. The coroner's findings were stipulated to at trial. The coroner found that a single bullet entered the right side of the victim's back and exited his torso through the left side of his chest more than two inches higher than where it entered. The coroner found that "[t]here [was] no evidence of close range fire." The coroner also found that the victim's blood alcohol level was more than 10% at the time of the shooting.

3

Defendant testified as follows on direct examination:

"Q.     And do you aim at anyone when you fire these four shots.

A.     No.

Q.     Where do you fire the four shots from?

A.     I fired the shots -- As I'm firing the shots I'm moving away.  I don't even raise my gun.  I fire the shots from the side of my body.

Q.     And do you aim anywhere in particular when you shoot or - -

A.     Off to the right of the crowd.

Q.     And why do you aim off to the right of the crowd?

A.     Just because I just wanted to scare them."

On cross-examination, defendant testified as follows:

"Q.     You pointed a gun in his general direction and you pulled the trigger not once, not twice, not three times, but four times, correct?

A.     That is correct.

On re-direct, defendant testified as follows:

"Q.     When you fired that gun were you pointing at that group?

A.     No.

Q.      Where were you pointing in relation to where those four
people were standing?

A.      Off to the right.

Q.      Why did you point off to the right?

A.      Because I just wanted to scare 'em.

Q.      Were you trying to hit anyone?

A.      No.

                          ***

Q.      Did you see what any of them were doing as you were
shooting?

A.      No.

Defendant thereafter ran and reentered his automobile before driving off. He testified that he did not observe the victim fall or whether anyone in the group had been shot. Forensic investigator Carl Brasic found two fired 9-millimeter cartridge cases in the street. One cartridge was approximately seven feet north of the victim and the other was next to the victim's leg.

After the shooting, defendant sold the firearm to "some guy" for $90 because he "didn't want anything to do with this gun anymore." Defendant also testified that he abandoned the automobile he used that night at Fullerton and Lockwood, because he also wanted nothing further to do with it.

Gray later identified defendant as the man who exited the white, four-door Buick Regal on the night of the shooting with a gun when he spoke to police, when he gave a statement to Assistant State's Attorney (ASA) DiBenedetto on June 15, 2003, when he testified before the grand jury on July 16, 2003, and at trial. Gray testified at trial that when defendant exited from his vehicle with his firearm, he was able to observe that the handgun had a metal attachment that he assumed to be a scope.

John Powell, who was with Gray on the evening of June 12, 2003, testified that he was drunk and repeatedly asserted that he did not remember the events of that evening. However, he later admitted that he had given a signed statement that he fled after someone had stated that someone had a gun. Powell stated that he did not remember telling the police that he observed defendant in the parking lot just prior to the shooting or that he told the police that he observed defendant driving away from the scene immediately after the shooting.

Lydale Durr was using the pay phone outside the liquor store on the evening of the shooting. He testified that he observed a white four-door Buick Regal pull into the parking lot. A man, standing at about 6 feet two 2 inches tall and weighing between 280 to 300 pounds, exited the automobile with an object in his right hand. Durr entered the liquor store and heard three or four gunshots about 5 to 10 minutes later. Durr did not observe the shooting and did not observe the white Buick Regal leave the area.

Young testified that he and the victim were selling marijuana in the alley at Monticello and Division on the night of the shooting. He testified that on the night of the

shooting Angelica Barber had "shouted out" to him and the victim and that they greeted her, just prior to the gunshots. He testified that he did not see who shot the victim. Young did testify that defendant owned the white Buick Regal, but he did not observe anyone with a firearm. On cross-examination, Young testified that defendant's sister, Keana, and the victim dated in the past.

Angelica Barber did not testify at trial.

The trial judge denied defendant's request that his sister, Keana, be allowed to testify for the limited purpose of establishing that she and the victim had a previous dating relationship, that she was hospitalized after a fight with the victim, and that defendant had knowledge of the fight.

At the close of evidence, the trial court denied defendant's requests to instruct the jury on involuntary manslaughter and second-degree murder. The jury returned a guilty verdict for first-degree murder. Defendant's motion for a new trial was denied and this appeal followed.

ANALYSIS

Defendant first argues that he was entitled to a jury instruction on the lesser-included offense of involuntary manslaughter. Defendant contends that there is substantial evidence contained in the record of this case that supports the conclusion that defendant acted recklessly, rather than intentionally, in firing the shot that killed the victim, thus supporting a manslaughter instruction. Defendant emphasizes his own testimony that: (1) he did not aim or point the firearm at the victim or the people with the

victim, (2) he discharged his firearm from his hip and did not raise his arm and aim the firearm at the victim, (3) he shot to the right of the victim and victim's company, (4) the firearm was not equipped with a scope or sight, (5) he had never fired a gun before, (6) it was dark and rainy on the night of the shooting, (7) he was sleep deprived when he fired the firearm, (8) the shots were fired in rapid succession, with no opportunity to independently aim each of the shots, (9) he was 25 to 30 feet from the victim when the shots were fired, (10) he was backing away from the victim as he discharged the firearm, and (11) he knew the victim to have violent proclivities. Defendant argues that a reasonable jury could have concluded that he was reckless with respect to his actions and did not have the mental state required for first-degree murder. Accordingly, defendant argues that he is entitled to a new trial before a properly instructed jury.

"The giving of jury instructions is a matter within the sound discretion of the trial court." *People v. Jones*, 219 Ill. 2d 1, 31 (2006), citing *People v. Castillo*, 188 Ill. 2d 536, 540 (1999). "[A]n instruction is justified on a lesser offense where there is some evidence to support the giving of the instruction." *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998), citing *People v. Jones*, 175 Ill. 2d 126, 132 (1997). An instruction should be given if there is some credible evidence in the record that would reduce the crime of first-degree murder to involuntary manslaughter. *DiVincenzo*, 183 Ill. 2d at 249, citing *People v. Foster*, 119 Ill. 2d 69, 87 (1987); *People v. Ward*, 101 Ill. 2d 443, 451 (1984). However, a manslaughter instruction should not be given where the evidence shows that

the homicide was murder, not manslaughter. *People v. Arnett*, 217 Ill. App. 3d 626, 634 (1991), citing *People v. Simpson*, 74 Ill. 2d 497 (1978).

"The offenses of involuntary manslaughter and first degree murder require different mental states, such that involuntary manslaughter requires a less culpable mental state than first degree murder." *Jones*, 219 Ill. 2d at 30. "[A] defendant commits first-degree murder when he kills an individual without lawful justification and he knows that his acts create a strong probability of death or great bodily harm." *DiVincenzo*, 183 Ill. 2d at 249-50, citing 720 ILCS 5/9-1(a)(2) (West 2000). Contrarily, "a defendant commits involuntary manslaughter when he performs acts that are likely to cause death or great bodily harm to another and he performs those acts recklessly." *DiVincenzo*, 183 Ill. 2d at 250, citing 720 ILCS 5/9-3(a) (West 2000). Recklessness is defined in section 4-6 of the Criminal Code of 1961:

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2000).

"While a defendant is entitled to an involuntary manslaughter instruction if there is 'slight' evidence upon which a given theory could be based, there must be some evidence of the reckless conduct." *People v. Eason*, 326 Ill. App. 3d 197, 209 (2001),

citing *People v. Trotter*, 178 Ill. App. 3d 292, 298 (1988). "Certain factors may suggest whether a defendant acted recklessly and whether an involuntary manslaughter instruction is appropriate: disparity in size and strength between the defendant and the victim, the severity of the victim's injuries, whether the defendant used his bare fists or a weapon, whether there were multiple wounds, or whether the victim was defenseless." *Eason*, 326 Ill. App. 3d at 209, citing *DiVincenzo*, 183 Ill. 2d at 251.

"Illinois courts have consistently held that when the defendant intends to fire a gun, points it in the general direction of his or her intended victim, and shoots, such conduct is not merely reckless and does not warrant an involuntary-manslaughter instruction, regardless of the defendant's assertion that he or she did not intend to kill anyone." *People v. Jackson*, 372 Ill. App. 3d 605, 613-14 (2007), citing *Eason*, 326 Ill. App. 3d at 210. "A defendant's 'testimony that he did not intend to kill anyone does not provide a sufficient basis for instructing on involuntary manslaughter.' " *Jackson*, 372 Ill. App. 3d at 614, citing *People v. Cannon*, 49 Ill. 2d 162, 166 (1971).

As noted in *Jackson* by the Fourth District of this court, the above-stated rule does not suggest that a defendant's testimony is never worthy of belief. *Jackson*, 372 Ill. App. 3d at 614. "The jury is not entitled to disregard defendant's testimony merely because he is the defendant in the case." *Jackson*, 372 Ill. App. 3d at 614, citing *People v. Barney*, 176 Ill. 2d 69, 74 (1997). "Rather, a defendant is not entitled to reduce first degree murder to [involuntary manslaughter] by a hidden mental state known only to him and unsupported by the facts." *Jackson*, 372 Ill. App. 3d at 614.

In the present case, defendant spotted the victim as he pulled away from his residence in his automobile. He unsuccessfully attempted to locate the victim in the parking lot of the liquor store located on Division and Monticello in Chicago after losing sight of him. He returned to his automobile and drove around the block into an alley, located behind the liquor store, west of North Monticello. He parked his automobile, exited, took a few steps east toward Monticello, and visually located the victim and those with the victim. Defendant fired four shots from his 9-millimeter handgun in the general direction of the victim and the others with him. Angelica Barber was shot in the arm. The victim was shot in the back and died from the gunshot wound. Nothing in the record indicates whether the victim had a weapon. The evidence does, however, indicate that the victim was not brandishing a weapon at the time of the shooting and was not even aware of defendant's presence prior to being shot. Two fired 9-millimeter cartridge cases were discovered in the street; one cartridge was approximately seven feet north of the victim and the other was next to the victim's leg. After the shooting, defendant sold the firearm and abandoned his vehicle.

As noted, defendant refers to his own testimony that he intended to fire his weapon to the right of the group as a warning and to demonstrate that he was willing to protect his family. However, the undisputed evidence that two of the four bullets fired from his weapon actually struck human targets undercuts defendant's argument.

Defendant then argues that the coroner's report corroborates his testimony that he intended to shoot to the right of the group. As noted, defendant testified that the victim

was standing 20 to 30 feet away from him, with the left side of the victim's body facing defendant. The coroner's report indicates that the bullet that struck and killed the victim entered his torso through the right side of his back and exited through the left side of his chest. Defendant argues that this evidence lends credit to defendant's testimony because it indicates that the victim moved into the path of the bullet. We find defendant's argument unpersuasive.

We initially note that defendant was the only person to testify that the victim was standing with his left side to him. Secondly, we note Young's testimony that Angelica Barber "shouted out" to him and the victim, and that he and the victim had turned to greet her. Young's testimony contradicts defendant's testimony that the victim moved into the path of the victim and indicates that it may have been the victim's right side that was exposed to defendant. In any event, we find that the undisputed evidence that two of the four bullets fired from defendant's weapon actually struck human targets dispositive of defendant's argument.

Accordingly, we find that the trial court did not abuse its discretion when it denied defendant's request to instruct the jury on involuntary manslaughter.

Defendant next contends that he was entitled to a jury instruction on the lesser-included offense of second-degree murder. He contends that the victim's threat to the safety of his seven-year-old daughter, issued by a person whom defendant knew had a history of violence, who dealt drugs, and carried a firearm, constituted serious

provocation sufficient to give rise to a sudden and intense passion the next time defendant saw him.

As noted, the giving of jury instructions is a matter within the sound discretion of the trial court. *People v. Jones*, 219 Ill. 2d at 31.

"A person commits the offense of second degree murder when he commits the offense of first-degree murder *** [when at] the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed." 720 ILCS 5/9-2(a)(1) (West 2000). "Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2(West 2000). For defendant to be guilty of second-degree murder, the State must first prove defendant guilty of first-degree murder beyond a reasonable doubt. 720 ILCS 5/9-2(c) (West 2000). The burden then shifts to the defendant to prove serious provocation by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2000).

The only categories of serious provocation that are recognized by the Illinois Supreme Court are: (1) substantial physical injury or assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse. *People v. Chevalier*, 131 Ill. 2d 66, 73 (1989). "Although these categories were originally components of the predecessor offense of voluntary manslaughter, they apply equally to second degree murder, which has essentially the same elements." *People v. Garcia*, 165 Ill. 2d 409, 429 (1995).

In the instant case, defendant contends that he was acting under a sudden and intense passion when he saw the victim for the first time after the victim's threat to the safety of his daughter. For this proposition, defendant cites to several cases that deemed threats to or acts done upon the defendants' children were sufficient provocation to warrant a second-degree-murder instruction.

Defendant first cites to *People v. Shields*, 143 Ill. 2d 435, 451-52 (1991). In *Shields*, the victim provoked the defendant by approaching her with a meat cleaver and threatening her and her children, who were present, immediately preceding the shooting. Defendant then cites to *People v. Robles*, 30 Ill. App. 3d 335, 336 (1975), which involved a situation where the victim provoked the defendant by putting his arms around defendant's daughter in defendant's presence. Lastly, defendant cites to *People v. Rice*, 351 Ill. 604, 609 (1933), where the victim provoked defendant by slapping the defendant's daughter in defendant's presence.

The cases cited by defendant do not apply to the case at bar. Firstly, defendant was not in the vicinity of the victim when the claimed threat concerning defendant's daughter occurred. Secondly, the victim made no physical contact with defendant's daughter. Thirdly, a substantial period of time elapsed between the claimed threat and the shooting. As noted, defendant drove his daughter to Tennessee, drove back to Chicago, went out of town on a moving job, returned to Chicago, worked an entire shift for his second job at a hardware store, and then shot and killed the victim. Also of great import was the fact that the defendant's daughter was in Tennessee at the time of the

shooting, and the victim was of no apparent threat to defendant's daughter at that time. Accordingly, defendant's argument that the trial court erred by not instructing the jury as to second-degree murder is unpersuasive.

Defendant next contends that the trial court erred by denying defendant's *Batson* motion where, at the third stage of the *Batson* inquiry, the trial court did not make a "sincere and reasoned" inquiry into the race-neutral explanations given by the prosecution for its peremptory challenges.

The United States Supreme Court has established a three-step procedure to determine whether the State's use of peremptory challenges resulted in the removal of venire persons on the basis of race. "First, the defendant must make a *prima facie* showing that the prosecutor *** exercised peremptory challenges on the basis of race." *People v. Williams*, 209 Ill. 2d 227, 244 (2004), citing *People v. Munson*, 171 Ill. 2d 158, 174 (1996). "Second, once such a showing has been made, the burden shifts to the State to provide a race-neutral explanation for excluding each of the venire persons in question." *Williams*, 209 Ill. 2d at 244. "Defense counsel may rebut the proffered explanations as pretextual." *Williams*, 209 Ill. 2d at 244, citing *People v. Mitchell*, 152 Ill. 2d 274 (1992). "Finally, the trial court determines whether the defendant has met his burden of demonstrating purposeful discrimination." *Williams*, 209 Ill. 2d at 244.

In the instant case, the trial judge ruled on the ultimate issue of purposeful discrimination after stating that he did not feel that defendant had established a *prima facie* case of discrimination. The law is clear that the question of whether the defendant

15

established a *prima facie* case of purposeful discrimination is now moot, since the court proceeded to the third stage of inquiry. *People v. Mays*, 254 Ill. App. 3d 752, 758 (1993), citing *Hernandez v. New York*, 500 U.S. 352, 360, 114 L. Ed. 2d 395, 406, 111 S. Ct. 1859, 1866 (1991). "On appeal therefore, we must determine whether the State has met its burden of providing 'clear and reasonably specific' race neutral-explanations [that] are related to this particular case." *Mays*, 254 Ill. App. 3d at 758-59. The State in this case exercised three of its first four peremptory challenges against black venire persons. The three black venire persons were: Alisha Pinex, Birdia Clayton, and Andrew George. During jury selection, defendant conceded that the peremptory challenge to Andrew George was proper, as Mr. George had two family members that had been convicted of crimes and were serving sentences at the time of trial. Accordingly, we must examine the explanations offered by the State as a justification for the exclusion of Ms. Pinex and Ms. Clayton. "If the State fails to meet its burden on one of these challenges, defendant's conviction must be reversed and the case remanded for a new trial." *Mays*, 254 Ill. App. 3d at 759.

The prosecutor asserted that she challenged Ms. Pinex because she indicated during *voir dire* that she had dated a man that had been accused of a firearm violation. The prosecutor claimed that she could not obtain a definite answer from Ms. Pinex as to whether her ex-boyfriend was convicted or acquitted of the charge against him. She also expressed concern that Ms. Pinex could be biased against the police and State because of

the charge against her ex-boyfriend. We agree with the trial court's finding that these reasons were facially race-neutral.

On appeal, defendant contends that the reasons proffered by the State to the peremptory challenge of Ms. Pinex were merely pretexual. Defendant states that a white venire person who had been accused of a crime was not peremptorily challenged by the State. Defendant cites to the *voir dire* examination of potential juror Alexander Juska. Mr. Juska stated that he had been accused of a traffic violation and had spent a night in jail in relation to the traffic violation because he could not post bond. We are not persuaded by defendant's argument that the absence of a peremptory strike to Mr. Juska demonstrates that the prosecutor's challenge to Ms. Pinex was merely pretextual. The prosecutor may well have based her challenge to Ms. Pinex, and not challenged Mr. Juska, based on the fact that the crime Ms. Pinex's ex-boyfriend was accused of involved a firearm, like defendant in this case.

Defendant then contends, in his reply brief to this court, that the prosecutor's challenge to Ms. Pinex was merely pretexual because a non black venire person, Ms. Martin, had indicated that one of her relatives had recently been accused of a crime. Initially we note that defendant's argument is waived for failure to raise that argument in his opening brief to this court. 210 Ill. 2d R. 341(h)(7). However, even if not waived, defendant's argument is unpersuasive. The peremptory challenge to Ms. Pinex was race-neutral as the prosecutor maintained that she challenged Ms. Pinex because of the intimate relationship Ms. Pinex shared with an accused. The prosecutor may well have

based her challenge to Ms. Pinex, and not challenged Ms. Martin, based on the differing degrees of intimacy between Ms. Pinex and her boyfriend and Ms. Martin and her relative.

We thus find defendant's argument as to the peremptory challenge of Ms. Pinex unpersuasive.

The prosecutor asserted that she challenged Ms. Clayton because this venire person indicated on her jury information card that she had served on a jury before, but could not recall whether that jury sat on a criminal or civil matter. The prosecutor also stated that Ms. Clayton was extremely soft spoken and that she appeared to be "not too aware of what was going on around her."

Historically, demeanor, body language, and the manner of answering questions have been important factors in jury selection and constitute legitimate, racially neutral reasons for exercising peremptory challenges. *People v. Banks*, 241 Ill. App. 3d 966, 976 (1993). "However, such demeanor-based explanations 'must be closely scrutinized because they are subjective and can be easily used by a prosecutor as a pretext for excluding persons on the basis of race.' " [Citation]. Banks, 241 Ill. App. 3d at 976. "The trial judge's determination on this issue is a finding of fact which, in large part, will turn on an evaluation of [the prosecutor's] credibility." *Mays*, 254 Ill. App. 3d at 758. "Therefore, the trial judge's ruling must be afforded great deference on appeal and will not be reversed unless clearly erroneous." *Mays*, 254 Ill. App. 3d at 758. A trial court's decision will be deemed "clearly erroneous" if the reviewing court is left with a definite

and firm conviction that a mistake has been committed. *People v. Boston*, 224 Ill. App. 3d 218, 223 (1991).

The trial judge in this case observed Ms. Clayton's behavior and demeanor, engaged counsel for the State and defendant in conversation regarding the challenge and determined the prosecutor's explanation was race-neutral. This court cannot say that the court's finding was clearly erroneous especially in light of the trial judge's statement that he did not feel that defendant had established a *prima facie* case of discrimination on the part of the State in the first place.

Defendant next contends that the trial court erred by barring defendant's sister from testifying at trial. Defendant contends that his sister's testimony corroborated defendant's theory of his case, specifically, that he committed a lesser-included offense of first-degree murder because he was fearful that the victim was going to harm his daughter.

"[E]videntiary rulings are within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *People v. Wheeler*, 226 Ill. 2d 92, 132 (2007). "Such an abuse of discretion will be found only where the trial court's decision is ' "arbitrary, fanciful or unreasonable" ' or ' "where no reasonable man would take the view adopted by the trial court." ' [Citations.] *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). "The controlling principles concerning the admissibility of evidence are well settled. The trial court must [determine] whether the proferred evidence fairly tends to prove or disprove the offense charged and whether [the] evidence is relevant in that it

tends to make the question of guilt more or less probable." *Wheeler*, 226 Ill. 2d at 132.
"It is entirely within the discretion of the trial court to 'reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or possibly unfair prejudicial nature.' [Citation]." *Wheeler*, 226 Ill. 2d at 132.

Defendant claims that each party is entitled to present evidence which is relevant to its theory of the case. *Wheeler*, 226 Ill. 2d at 132, citing *People v. Molsby*, 66 Ill. App. 3d 647 (1978). While this is true, it is also true that defining the precise limits controlling the admissibilty of such evidence can be a difficult task for the trial court, and if the evidence is too remote in time to shed light on the facts to be found, it should be excluded. *Wheeler*, 226 Ill. 2d at 132.

Defendant contends that his sister's testimony would have bolstered the credibility of his theory that he was fearful of the victim, would have explained why defendant did not announce his presence prior to firing the fatal shot, and would have countered the State's argument that defendant was not fearful of the victim.

The State contends that the testimony of defendant's sister would have only demonstrated the victim's violent propensities. The State reasons that since this case did not involve self-defense, the testimony establishing the victim's violent propensities was irrelevant and prejudicial. The State argues that the testimony is irrelevant because the incident that defendant's sister would have testified to was too remote to bear on the instant crime. As noted, the victim had beaten defendant's sister three or four years prior to the shooting. We agree with the State.

20

The testimony of defendant established that he fired four shots in the general direction of the victim and those with him without the victim's knowledge of defendant's presence in the area. As the victim's violent propensities did not bear on whether defendant committed the crime of first-degree murder since the instant case did not involve a situation of self-defense, the proffered testimony of defendant's sister was irrelevant. Furthermore, the incident that defendant claimed made him fearful of the victim was too remote to bear on defendant's fear of the victim on the night of the shooting. We therefore find defendant's argument that the trial court erred by not allowing defendant's sister to testify at trial unpersuasive.

Defendant then argues that the court erred when it repeatedly sustained unexplained objections by the State during defendant's cross-examination of Gray and Young.

Gray testified on direct examination that he observed defendant pull up to the liquor store in a white four-door vehicle. He then stated that defendant exited from his vehicle bearing a large firearm with an attachment. The witness assumed that the attachment on the firearm was either a scope of a laser sight. On cross-examination, defense counsel asked Gray if he had ever fired a gun and whether he had ever fired a gun with a scope on it. Both questions were objected to by the State, without explanation. The trial court sustained both objections without asking the State for the reasons for its objection. On appeal, defendant argues that the questioning went to

Gray's knowledge of firearms and his ability to testify as to whether the firearm he saw defendant holding had a scope or laser sight on it.

On cross-examination Young was asked if he and the victim were bearing firearms on the night of the shooting or whether he and the victim customarily bore firearms when they would deal drugs. Both questions were objected to by the State, without a reason given for the objections. The trial judge again sustained the objections without asking the State to give a reason for the objections. On appeal, defendant argues that the questioning went to the reasonableness of defendant's fear of the victim.

Assuming *arguendo* that the trial court erred by sustaining the unexplained objections made by the State in relation to Gray's and Young's testimony, it is not likely that the result of the trial would have been any different. The exclusion of admissible evidence is subject to a harmless error analysis. *People v. Damnitz*, 269 Ill. App. 3d 51, 60 (1994). "This court will not reverse a conviction based upon the exclusion of admissible evidence unless the evidence could reasonably have affected the verdict." *Damnitz*, 269 Ill. App. 3d at 60-61.

As noted, defendant spotted the victim as he pulled away from his residence in his automobile. He unsuccessfully attempted to locate the victim in the parking lot of the liquor store located on Division and Monticello after losing sight of him. He returned to his automobile and drove around the block into an alley, located behind the liquor store, west of Monticello. He brought his automobile to a stop, exited, took a few steps east toward Monticello, and visually located the victim and those with him. Defendant fired

four shots from his 9-millimeter handgun in the general direction of the victim and the others. Angelica Barber was shot in the arm, and the victim was shot in the back and died from the gunshot wound. Nothing in the record indicates whether the victim had a weapon. The evidence does indicate that the victim was not brandishing a weapon at the time of the shooting and was not even aware of defendant's presence prior to defendant firing his weapon. Two fired 9-millimeter cartridge cases were discovered in the street; one cartridge was approximately seven feet north of the victim and the other was next to the victim's leg. After the shooting, defendant sold the firearm and abandoned the white four-door Buick Regal at Fullerton and Lockwood, because he wanted "nothing further" to do with either.

In light of the overwhelming evidence of defendant's guilt, including the fact that two of only four bullets discharged from defendant's firearm landed on human targets, we find that if sustaining the State's unexplained objections was error, it was harmless.

Finally, defendant argues that the trial court erred when it sustained unexplained objections by the State without explanation during the direct examination of defendant. Specifically, defendant argues that the trial court erred when it sustained the State's objections without reasons to a line of questioning that was intended to establish defendant's reasonable belief that the victim and others in victim's company were carrying firearms on the night in question.

Assuming *arguendo* that the trial court erred by sustaining the unexplained objections made by the State in relation to defendant's testimony that he had reason to

23

believe that the victim and other in victim's company were carrying firearms on the night in question, it is not likely that the result of the trial would have been any different. It is at this point unnecessary to reiterate the overwhelming evidence of defendant's guilt, of first-degree murder, since we have already done so.

In light of the overwhelming evidence of defendant's guilt including the fact that two of only four bullets discharged from defendant's firearm actually landed on human targets, we find that if sustaining the State's unexplained objections was error, it was harmless.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CAHILL, P.J., and GARCIA, J., concur.